Filed 8/16/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| DIOKA OKORIE et al., | B268733 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC582670) |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT et al., | |
| Defendants and Respondents. | |


APPEAL from an order of the Superior Court of Los Angeles County, Deirdre H. Hill, Judge.  Affirmed.

Law Offices of Akudinobi & Ikonte, Chijioke O. Ikonte; Law Office of Metu C. Ogike and Metu Chikezie Ogike for Plaintiffs and Appellants.

Anthony J. Bejarano, Assistant General Counsel, and Alexander Molina, Chief Labor and Employment Counsel, for Defendants and Respondents

_____

In 2015, Dioka Okorie (Okorie) sued his employer, Los Angeles Unified School District (LAUSD) and two of his supervisors, Jacqueline Hughes (Hughes) and Cynthia Jackson (Jackson) (collectively, Defendants), alleging, among other things, discrimination, harassment, and retaliation. In response, Defendants filed a special motion to strike the complaint pursuant to section 425.16 of the Code of Civil Procedure[1]—a so-called anti-SLAPP motion[2]—which the trial court granted.

On appeal, Okorie and his wife, Nkeiru Okorie (collectively, Plaintiffs) advance two principal arguments. First, they contend that the trial court erred in granting the anti-SLAPP motion because the complaint contained allegations regarding both protected and unprotected activities by the Defendants. Second, they argue that the motion should have been denied because they demonstrated a likelihood of success on certain of their causes of action. We disagree with both arguments and, accordingly, affirm.

_____

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] SLAPP is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.)

2

## BACKGROUND

### I. Plaintiffs' complaint

According to the complaint, in 2003, LAUSD hired Okorie as a teacher at Westport Heights Elementary School. While at the school, Okorie took on a number of responsibilities in addition to his classroom duties; for example, after normal school hours (i.e., when he was not being paid) he worked with at-risk students.

In 2013, LAUSD appointed Hughes as the school's principal. Shortly thereafter Hughes allegedly began to harass Okorie on a "constant" or "monthly" basis. Among other things, Hughes purportedly questioned Okorie's disciplinary practices, telling him, " 'I know you are from Africa and the way you reprimand kids in Africa is different from here in America.' " In addition, Hughes undermined Okorie's reputation with his coworkers by telling them that "parents were complaining to her about [him]," but never meeting with Okorie to discuss these complaints. Moreover, Hughes would allegedly have "meetings with other members of the [school's] teaching staff but would not meet with [him]" and would "send messages and directives to [him] through his colleagues." At one point, Hughes allegedly asked Okorie to "bear false witness" against a parent in favor of another teacher; when Okorie refused to do so, Hughes's alleged harassment of Okorie "intensified." This intensified harassment included "meritless write ups" that were hand delivered by the school's administrative staff to Okorie during "instructional hours."

3

On April 4, 2014, Hughes summoned Okorie to her office where Jackson, a representative of LAUSD's Educational Service Center West (ESC), advised Okorie that an " 'allegation' " had been made against him and, as a result, he was reassigned to his home pending the investigation. Hughes subsequently advised the school's parents that Okorie had been "walked off campus for misconduct and the . . . safety of staff and students." Shortly after putting Okorie on home leave, Hughes advised him that he had been reassigned to ESC, which, according to Okorie is "commonly known as teacher jail." At ESC, Okorie suffered harassment from Jackson on a "weekly basis." Among other things, the harassment involved Jackson yelling at Okorie as she demanded that he return the computer that LAUSD had issued to him. Okorie remained at ESC until LAUSD charged him with misconduct involving students.

On the morning of October 13, 2014, LAUSD investigators appeared at Okorie's home with a search warrant. As some of the officers searched the home for a laptop and a computer tablet, other officers questioned Okorie and his wife while their children were in the living room crying; the questioning included inquiries about the Ebola outbreak that was at the time occurring in several countries in West Africa.

Plaintiffs do not allege that LAUSD ever terminated Okorie's employment. Instead they allege that "[a]s a result of the [accumulation] of the above described

4

incidents . . . . Plaintiffs . . . faced unimaginable humiliation and embarrassment" due to Defendants' conduct.[3]

Based on these factual averments, Plaintiffs asserted eight separate causes of action: five claims brought pursuant to the Fair Employment and Housing Act (FEHA)—discrimination based on race and national origin; gender discrimination; retaliation; failure to prevent discrimination; and racial harassment; two common law causes of action—intentional infliction of emotional distress and defamation; and a federal civil rights cause of action brought pursuant to title 42 United States Code section 1983.

Consistent with their accumulation theory, Plaintiffs do not identify specifically or list separately each act of alleged misconduct by Defendants giving rise to each cause of action. For example, in connection with their employment discrimination causes of action, Plaintiffs do not identify the specific adverse employment actions giving rise to their claims. Instead, they allege generally that all of the various acts of misconduct identified in the section of their complaint entitled "FACTS COMMON TO ALL CAUSES OF ACTION" constitute the operative adverse employment actions. (Underscore omitted.)

---

[3] In their complaint Plaintiffs used the word "culmination," not "accumulation." However, based on the surrounding language, it appears that Plaintiffs meant accumulation, not culmination. Accordingly, we will proceed as though Plaintiffs had chosen accumulation.

## II. Defendants' anti-SLAPP motion

Defendants challenged Plaintiffs' complaint by filing an anti-SLAPP motion only. In other words, Defendants' special motion to strike was not accompanied by any other challenges, such as a demurrer and/or a conventional motion to strike. In their anti-SLAPP motion, which sought to strike the entire complaint, the Defendants argued that the gravamen of the complaint (as well as each individual cause of action) was based on protected activity—speech or communicative conduct either made as part of or as a precursor to the internal investigation that LAUSD undertook in response to a molestation allegation made against Okorie.

In support of their anti-SLAPP motion, the Defendants provided additional information regarding the alleged molestation. Much of this information came from John Metcalf (Metcalf), an investigator on LAUSD's Student Safety Investigation Team (SSIT). On March 31, 2014, during a retreat, a senior at St. Bernard High School revealed to 68 classmates and five teachers that, when he was younger, he had been molested by a teacher. The next day, the student's teacher made a state-mandated report of suspected child abuse. While being interviewed by officers from the Los Angeles Police Department (LAPD), the student identified Okorie as his molester. The student further stated that Okorie had molested him on three separate occasions: March 2006; November 2006; and February 2007.

On April 2, 2014, LAPD informed LAUSD of the student's allegations. Two days later, on April 4, 2014, LAUSD removed Okorie from his classroom and assigned him to his home pending the investigation into the allegations. Throughout the course of the subsequent investigation, Okorie refused to answer questions from either the LAPD or SSIT.

As part of SSIT's investigation into the molestation allegations, LAUSD directed Okorie to turn over all LAUSD computer equipment that had been issued to him, including a laptop and a computer tablet. Okorie advised LAUSD that he did not know where the computers were. LAPD subsequently obtained a warrant to search the records of Okorie's personal internet service provider; those records revealed that the laptop and the tablet were accessing internet service from Okorie's home. In October 2014, five months after first being asked to return LAUSD's property, LAUSD, pursuant to a search warrant, found the computers at Okorie's home.

During the course of its investigation into the molestation allegation, SSIT became aware of two alleged incidents of improper discipline and child abuse by Okorie during the period 2011–2013.

## III. Plaintiffs' opposition

In their opposition, Plaintiffs stressed that not all of the alleged misconduct arose out of the molestation investigation, that some of the alleged misconduct predated the investigation.

7

In support of their opposition to Defendant's anti-SLAPP motion, Plaintiffs submitted a number of declarations, including a declaration by Okorie. In his declaration, Okorie provided additional details about the acts of harassment alleged in the complaint. With regard to the return of the computer devices issued to him by LAUSD, Okorie denied lying about the whereabouts of the computers and stated that he did not need to return the property when requested to do so in May 2014, because at the time he was still a LAUSD employee. He flatly denied the molestation allegation and improper discipline allegations.

Most of the other declarations derived from various character witnesses—parents of students taught by Okorie and pastors, all of whom attested to Okorie's high moral temperament and abilities as a teacher.

In addition, Plaintiffs filed evidentiary objections to Metcalf's declaration.

## IV. The trial court's ruling

On November 6, 2015, the trial court heard oral argument on Defendants' anti-SLAPP motion, took the matter under submission, and then issued a written ruling granting the motion. The trial court found that Plaintiffs' claims were subject to the anti-SLAPP statute because the "gravamen of the complaint" related to protected conduct by LAUSD: communications and actions related to the internal investigation into the molestation allegations. With regard to Plaintiffs' evidence, the trial court found that the "character" declarations were irrelevant, as they did not

offer any facts to support the allegations of the complaint. As for Okorie's declaration, the trial court found it to be "fraught with inadmissible legal conclusions accusing of harassment rather than setting forth factual allegations evidencing the same." As a result, the trial court determined that Okorie had failed to present "a prima facie case of the core contentions in his complaint of discrimination, harassment or retaliation."

Plaintiffs filed a timely notice of appeal.

## DISCUSSION

## I. The anti-SLAPP statute and applicable legal principles

### A. SECTION 425.16

"A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. ' "While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right." ' " (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 (*Simpson*).)

"In 1992, out of concern over 'a disturbing increase' in these types of lawsuits, the Legislature enacted section 425.16, the anti-SLAPP statute. (§ 425.16, subd. (a).) The statute authorized the filing of a special motion to strike to expedite the early dismissal of these unmeritorious

claims.  (§ 425.16, subds. (b)(1), (f).)  To encourage 'continued participation in matters of public significance' and to ensure 'that this participation should not be chilled through abuse of the judicial process,' the Legislature expressly provided that the anti-SLAPP statute 'shall be construed broadly.' (§ 425.16, subd. (a).)"  (*Simpson*, *supra*, 49 Cal.4th at p. 21.)

The anti-SLAPP statute "provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity."  (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)  The statute applies to "cause[s] of action against a person *arising from any act of that person in furtherance of the person's right of petition or free speech* under the United States Constitution or the California Constitution in connection with a public issue."  (§ 425.16, subd. (b)(1), italics added.)  As used in the statutory scheme, an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of

10

petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

B.    EVALUATING ANTI-SLAPP MOTIONS

In ruling on a motion under section 425.16, the trial court engages in what is now a familiar two-step process. "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral, supra*, 1 Cal.5th at p. 384.)

1.    *Step one: protected activity?*

The moving party's burden at step one is to show "the challenged cause of action arises from protected activity." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.] 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e).'" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) In other words, "it is not enough to establish that the action

11

was filed in response to or in retaliation for a party's exercise of the right to petition. [Citations.] Rather, the claim must be *based on* the protected petitioning activity." (*Bergstein v. Stroock & Stroock & Lavan LLP* (2015) 236 Cal.App.4th 793, 804.) "[I]f the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step." (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 266, disapproved on other grounds in *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1071 (*Park*).)

      a.    <u>The principal thrust and gravamen analysis</u>

In determining whether a cause of action is based on protected activity, we "examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies." (*Ramona Unified School Dist. v. Tsiknas* (2005) 135 Cal.App.4th 510, 519–520.)[4] "We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.' " (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272.)

"When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at [the first] stage. If the court determines

---

[4] Gravamen is generally understood to mean "the substantial point or essence of a claim, grievance or complaint." (Black's Law Dict. (10th ed. 2014) p. 817, col. 1; Garner, Dict. of Modern Legal Usage (2d ed. 1995) p. 391 ["the point of a complaint or grievance"].)

12

that relief is sought based on allegations arising from activity protected by the statute, the second step is reached." (*Baral, supra,* 1 Cal.5th at p. 396.)  However, "if the allegations of protected activity are only incidental to a cause of action based essentially on nonprotected activity, the mere mention of the protected activity does not subject the cause of action to an anti-SLAPP motion."  (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 414; accord, *Kenne v. Stennis* (2014) 230 Cal.App.4th 953, 967–968; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1574.)  A claim based on protected activity is incidental or collateral if it "merely provide[s] context, without supporting a claim for recovery."  (*Baral,* at p. 394.)

Courts have held that a "mixed cause of action"—that is, one based on both protected and unprotected activity—"is subject to section 425.16 if at least one of the underlying acts is protected conduct, unless the allegations of protected conduct are merely incidental to the unprotected activity." (*Salma v. Capon* (2008)161 Cal.App.4th 1275, 1287). However, in making this inquiry, courts have generally gone beyond determining the mere existence of one claim of protected activity; instead, they look to see whether the essence or "bulk" of the cause of action is based on protected activity.  (*Id.* at p. 1288.)  For example, in *Wang v. Wal–Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, 809, the Court of Appeal overturned the trial court's ruling that the complaint arose from protected activity, holding that the

13

anti-SLAPP protections did not apply because the "overall thrust" of the complaint was based on unprotected activity and the protected activity—pursuit of government permits—was collateral to the parties' dispute. Similarly, in *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 273, the Court of Appeal affirmed the denial of defendant's anti-SLAPP motion because the "gravamen" of the plaintiff's complaint was not defendant's protected conduct; the defendant's petitioning activity was " 'only incidental' to a business dispute based on nonprotected activity."[5]

In short, "whether a cause of action is subject to a motion to strike under the SLAPP statute turns on whether the gravamen of the cause of action targets protected activity. [Citation.] If liability is not based on protected activity, the cause of action does not target the protected activity and is therefore not subject to the SLAPP statute. [Citations.] . . . [¶] Where, as here, a cause of action is based on both protected activity and unprotected activity, it is subject to section 425.16 ' "unless the protected conduct is 'merely incidental' to the unprotected conduct." ' " (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1550–1551.) In other words, "a

---

[5] See *California Back Specialists Medical Group v. Rand* (2008) 160 Cal.App.4th 1032, 1036–1037; *Freeman v. Schack* (2007) 154 Cal.App.4th 719, 727; *Gallanis–Politis v. Medina* (2007) 152 Cal.App.4th 600, 615; *Scott v. Metabolife Internat., Inc., supra*, 115 Cal.App.4th at p. 416; *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188.

plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one 'cause of action.' " (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308.)

  b.  The principal thrust or gravamen analysis after *Baral*

In the wake of *Baral, supra*, 1 Cal.5th 376, one court has rejected the principal thrust or gravamen analysis. (*Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1170 (*Sheley*).) We are not convinced, however, that *Sheley*'s rejection is well-taken.

First, *Sheley*'s wholesale rejection of the principal thrust or gravamen analysis is based largely on an extrapolation from *Baral, supra*, 1 Cal.5th 376. (*Sheley, supra*, 9 Cal.App.5th 1147.) In *Baral*, our highest court disapproved a number of cases that used the "primary right theory" to determine whether a cause of action is based on protected activity. (*Baral*, at pp. 394–395.) *Baral* explained that the primary rights theory has a " 'fairly narrow field of application. It is invoked most often when a plaintiff attempts to divide a primary right and enforce it in two actions.' " (*Id.* at p. 395.) In addition, "the primary right theory is notoriously uncertain in [its] application." (*Ibid.*) Based on *Baral*'s rejection of the primary rights theory, *Sheley* rejected the principal thrust/gravamen analysis. (*Sheley*, at p. 1170.) *Baral*, however, (as *Sheley* concedes) did

15

not address, let alone disapprove, the principal thrust/gravamen analysis.  (See *Sheley*, at p. 1170.)

Second, *Sheley*'s rejection appears to be based, in part, on an overbroad reading of *Baral*, *supra*, 1 Cal.5th 376.  (*Sheley*, *supra*, 9 Cal.App.5th 1147.)  In *Baral*, our Supreme Court simply held that a special motion to strike can reach distinct claims within pleaded counts, thereby disapproving the so-called *Mann* rule that only entire causes of action can be stricken (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90).  (See *Baral,* at p. 396 & fn. 11.)  But *Baral* did not say that a special motion to strike must always be limited to challenges within a pleaded count.  Rather, *Baral* adopted a permissive approach:  "the Legislature's choice of the term 'motion to strike' reflects the understanding that an anti-SLAPP motion, like a conventional motion to strike, *may* be used to attack parts of a count as pleaded."  (*Id.* at p. 393, italics added.)  In other words, a special motion to strike, like a conventional motion to strike may be used to attack an entire pleading, such as a complaint, and various subparts of a pleading, such as a cause of action or pleaded count, as well as component paragraphs, words or phrases.  Critically, in this case, Defendants did not move to strike certain subparts of Plaintiffs' complaint.  Instead, they expressly moved to strike Plaintiffs' entire complaint based on "the gravamen of the complaint."

Third, in *Baral, supra*, 1 Cal.5th 376, the court's holding was based on a conclusion that a special motion to

16

strike was substantially similar to a conventional motion to strike. (See *id.* at p. 394.) However, when a conventional motion to strike is directed at something less than an entire pleading or an entire cause of action, the notice of motion must quote in full the portions to be stricken so that there is no confusion among the parties and the trial court as to what is at issue and, if the motion is successful, what exactly is to be stricken. (Cal. Rules of Court, rule 3.1322.) There is, however, no such similar rule for special motions to strike either in the text of section 425.16 or the California Rules of Court. *Baral* did not address this practical but vital aspect of special motions to strike, because the anti-SLAPP motion at issue in that case did not seek to strike the entire complaint or even entire causes of action, but instead was limited to "isolated allegations within causes of action," namely all references to an audit. (*Baral*, at p. 384.) Thus, *Baral* is silent on how the parties, the trial court, and (given the immediate right of appeal for special motions to strike) a reviewing court are to proceed where the plaintiff's protected and unprotected claims, as here, are not well delineated and are even enmeshed one within another and the moving party has sought to strike the entire complaint.

Even before *Baral, supra,* 1 Cal.5th 376, courts worried that not allowing a defendant to strike claims within a cause of action would allow litigants to circumvent the anti-SLAPP law by artfully pleading allegations based on unprotected activity in the same cause of action as allegations based on protected activity. (See, e.g., *Cho v. Chang* (2013) 219

17

Cal.App.4th 521, 527; *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 774.) Unfortunately, absent further guidance to litigants as to how claims must be alleged and/or how special motions to strike must be framed, the protections of the anti-SLAPP law may still be circumvented by the inartful pleading of claims (deliberately or innocently) that allege both protected and unprotected activity. Accordingly, we hold that, under the facts of this case (where the plaintiff has not specifically asked for relief as to some specified unprotected conduct that is a subpart of a cause of action), the principal thrust/gravamen analysis remains a viable tool by which to assess whether a plaintiff's claim arises out of protected activity.

    c. <u>The defendant's burden</u>

A defendant's burden on the first prong is not an onerous one. A defendant need only make a prima facie showing that plaintiff's claims arise from defendant's constitutionally protected free speech or petition rights. (See (*Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456.) " 'The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish [his or] her actions are constitutionally protected under the First Amendment as a matter of law.' [Citation.] 'Instead, under the statutory scheme, *a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis*, and then permit the parties to address the issue in the second step of the analysis, if necessary.

18

[Citation.] Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens.' " (*Id*. at p. 458, italics added.)

### 2. *Step two: probability of prevailing?*

"If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral, supra*, 1 Cal.5th at p. 384.) The plaintiff must do so with admissible evidence. (*Kreeger v. Wanland* (2006) 141 Cal.App.4th 826, 831.) "We decide this step of the analysis 'on consideration of "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b).) Looking at those affidavits, "[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff." ' " (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 378–379, disapproved in part in *Baral*, at p. 396, fn. 11.) This second step has been described as a " 'summary-judgment-like procedure.' " (*Baral*, at p. 384.) A court's second step "inquiry is limited to whether the [opposing party] has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [The court] . . . evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Id*. at pp. 384–385.) "Only a [claim] that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being

stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

    C.    STANDARD OF REVIEW

"On appeal, we review the trial court's decision de novo, engaging in the same two-step process to determine, as a matter of law, whether the defendant met its initial burden of showing the action is a SLAPP, and if so, whether the plaintiff met its evidentiary burden on the second step." (*Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at pp. 266–267.)

## II.    The gravamen of Plaintiffs' claims[6] is protected activity

On appeal, Plaintiffs challenged the striking of only the following claims: discrimination based on race and national origin; failure to prevent discrimination; intentional infliction of emotional distress; harassment; and violation of title 42 United States Code section 1983. We hold that, on balance, that Plaintiffs' claims at issue in this appeal are based on protected activity.

---

    **6** To avoid confusion, our high court in *Baral, supra,* 1 Cal.5th 376 referred to "the proper subject of a special motion to strike as a 'claim' " instead of a " 'cause of action.' " (*Id.* at p. 382.) Accordingly, we do the same here.

## A. PLAINTIFFS' CLAIMS ARISE FROM STATEMENTS OR COMMUNICATIVE CONDUCT

At the outset, we note that in *Park, supra*, 2 Cal.5th 1057,[7] our Supreme Court clarified that "[a] claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Id.* at p. 1062.) " '[T]he defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech.' " (*Id.* at p. 1063, italics omitted.) "[T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' " (*Ibid.*) Put a little differently, courts must "respect the distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Id.* at p. 1064.)

In *Park, supra*, 2 Cal.5th 1057, a professor who was denied tenure sued the university alleging national origin discrimination. (*Id.* at p. 1061.) The university filed an anti-SLAPP motion, which the trial court denied, ruling that "the complaint was based on the University's decision to deny tenure, rather than any communicative conduct in

---

[7] The Supreme Court issued *Park, supra*, 2 Cal.5th 1057 shortly before oral argument in this case but after the parties had completed their briefing. Accordingly, at oral argument, we requested that the parties submit supplemental briefing on whether *Park* affects the resolution of this appeal.

connection with that decision." (*Ibid*.) The Court of Appeal reversed, holding that a claim alleging a discriminatory decision is subject to an anti-SLAPP motion so long as the protected speech and activity contributed to that decision. (*Id*. at pp. 1061–1062.)

Our highest court reversed, holding that a discrimination claim "may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, *supra*, 2 Cal.5th at p. 1060.) As the Court further explained, "What gives rise to liability is not that the defendant spoke, but that the defendant denied the plaintiff a benefit, or subjected the plaintiff to a burden, on account of a discriminatory or retaliatory consideration." (*Id*. at p. 1066.) "Failing to distinguish between the challenged decisions and the speech that leads to them or thereafter expresses them 'would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power.' [Citations.] . . . [Citation.] Conflating, in the anti-SLAPP analysis, discriminatory decisions and speech involved in reaching those decisions or evidencing discriminatory animus could render the anti-SLAPP statute 'fatal for most harassment, discrimination and retaliation actions against public employers.' " (*Id*. at p. 1067.) The *Park* court observed that while "[t]he tenure decision may have been communicated orally or in writing . . . that communication does not convert Park's suit to one arising from such speech."

(*Id*. at p. 1069.) In other words, the speech at issue in *Park* was incidental or collateral to the plaintiff's claim.

*Park*, *supra*, 2 Cal.5th 1057, does not help the instant Plaintiffs for two reasons. First, while the gravamen of the complaint in *Park* was, undeniably, the university's decision to deny the plaintiff tenure (*id*. at pp. 1067–1068), Plaintiffs' claims here are not based on a specific, unprotected adverse employment action. Instead, Okorie and his wife allege that Okorie suffered a wide array of adverse employment actions stretching over more than a year (from early 2014 to mid-2015). Second, and more critically, while some of those adverse employment actions involve arguably unprotected decisions by LAUSD (e.g., removal of Okorie from his classroom to his home; reassignment of Okorie from his home to ESC, the so-called teacher's jail), the bulk of those actions were statements or communicative conduct made by LAUSD personnel. In other words, in contrast to *Park*, the protected activity here "*itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Id*. at p. 1060.) *This conclusion is made manifest by the complaint.* For example, Plaintiffs complained that the phone calls made and the letters sent by defendant Hughes (the school's principal) to the school's parents following Okorie's removal from the school constituted "mistreatment and harassment." Similarly, Plaintiffs allege that a notice sent by LAUSD to the California credentialing commission after his removal from the classroom "shocked and humiliated" him. In

23

addition to protected speech which arose out of the molestation investigation, Plaintiffs premised their claims on a number of preinvestigation statements which purportedly caused injury, such as statements by Hughes to Okorie regarding corporal punishment practices in the United States versus those in Africa and the purportedly meritless write-ups of Okorie's deficiencies as a teacher.

The critical primary conduct here is quite different than that at issue in *Park*, *supra*, 2 Cal.5th 1057. "Park's complaint [wa]s 'based on the [single] act of denying plaintiff tenure based on national origin. [In *Park*,] [p]laintiff could have omitted allegations regarding communicative acts . . . and still state the same claims.' " (*Id.* at p. 1068.) In contrast, Plaintiffs' complaint here is based collectively on a handful of decisions (unsupported by any evidence of discriminatory animus) *and* a wide array of allegedly injury-causing statements and communicative conduct by Defendants. In other words, the speech complained of here does not merely "supply evidence of animus." (*Ibid.*) Rather, the speech at issue is explicitly alleged to be the injury-producing conduct. Because LAUSD's speech and communicative conduct is the wrong complained of, the next question in our inquiry is whether that speech and communicative conduct was protected.

B.    THE STATEMENTS AND COMMUNICATIVE CONDUCT AT ISSUE ARE PROTECTED

Plaintiffs allege that they were injured by Defendants' statements and communicative conduct both before and after

24

the molestation investigation. However, as noted above, Plaintiffs do not allege distinct pre- and postmolestation investigation claims. Instead, they allege that it was an accumulation of all of the alleged incidents that "materially affected" Okorie's employment. Although Plaintiffs claims are based, in part, on preinvestigation conduct by Defendants, during oral argument Plaintiffs' counsel effectively conceded that his clients would not have filed a lawsuit if the only conduct at issue was Defendants' preinvestigation conduct. Accordingly, we will focus on whether the alleged protected statements and communicative conduct made by Defendants in connection with their investigation were collateral to Plaintiffs' claims or constituted the principal thrust or gravamen of those claims.[8]

---

[8] Although our focus is on Defendants' statements made in connection with the molestation investigation, we believe that most of the preinvestigation statements are protected. It is well established that public employees enjoy First Amendment protections in regard to statements they make as part of their official duties on matters of public concern, even if those statements are made privately to other public employees. (See *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1117 ["[p]rivate conversations" concerning report protected under anti-SLAPP statute]; *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170, 1174–1176 [anti-SLAPP statute applied private conversation regarding public issue].) As the court in *Bradbury* observed, "The exchange of ideas would be unduly curtailed if a governmental entity and

It is well established that internal investigations constitute an "official proceeding authorized by law," which is another of the categories of protected activity under the anti-SLAPP statute. (§ 425.16, subd. (e); *Hansen v. Department of Corrections and Rehabilitation* (2008) 171 Cal.App.4th 1537, 1544 [dismissing emotional distress claim based on investigation].) In *Miller, supra*, 169 Cal.App.4th 1373, the Court of Appeal affirmed the trial court's decision to grant the defendant's anti-SLAPP motion because plaintiff's defamation and intentional infliction of emotional distress claims arose from protected activity because they

---

its representatives could not freely express themselves on matters of public interest." (*Bradbury*, at p. 1118.)

Here, most of the alleged preinvestigation statements—including statements by Hughes to Okorie concerning comparative corporal punishment practices, statements by Hughes to other teachers about parent complaints against Okorie because their "kids were scared of [him]," and Hughes's write-ups of Okorie for his failure to adhere to rules—were protected by the anti-SLAPP statute, because such statements concern "a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)), namely education and child and student safety. (See *Miller v. City of Los Angeles* (2008) 169 Cal.App.4th 1373, 1383 (*Miller*) [public employee's misconduct issue of public interest].) Plaintiffs, however, do allege one preinvestigation statement by Hughes that does not appear to be protected speech. Plaintiffs allege that in March 2014, Hughes purportedly asked Okorie to "bear false witness" in favor of another teacher and against a parent.

26

were based on a city's "investigation into [plaintiff]'s conduct in connection with his public employment and its determination and report that he had engaged in misconduct on the job." (*Id.* at pp. 1378–1379, 1383; *Gallanis–Politis v. Medina, supra,* 152 Cal.App.4th at pp. 610–611 [retaliation claim based on investigation protected activity].) In short, as another division of this court has stated, "It can no longer be questioned that section 425.16 extends to government entities and employees that issue reports and take positions on issues of public interest relating to their official duties." (*Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229, 1237–1238; see generally Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2016) ¶ 7:625, p. 7(II)–16.)

As a result, Plaintiffs' investigation-related speech allegations—e.g., statements to parents and others about Okorie's removal from the classroom and repeated demands for the return of LAUSD technology—were protected by the anti-SLAPP statute.

Because Defendants made a prima facie showing that the speech and communicative conduct at issue was protected, we must next determine if that protected activity was incidental or integral to Plaintiffs' claims.

C.    THE PROTECTED STATEMENTS AND COMMUNICATIVE
CONDUCT AT ISSUE ARE INTEGRAL, NOT INCIDENTAL, TO
PLAINTIFFS' CLAIMS

A fair reading of the complaint shows that the investigation-related statements at issue were not collateral to Plaintiffs' claims but formed the very heart of Plaintiffs' demands for relief.  The complaint's leitmotiv is a profound sense of humiliation—Plaintiffs allege that they "and their entire family have faced unimaginable humiliation and embarrassment" due to Defendants' alleged misconduct.  The complaint makes clear that the primary cause for this humiliation and embarrassment is LAUSD's speech and communicative conduct related to the investigation.  For example, Plaintiffs allege that the phone calls and letters to the parents following Okorie's removal from the school constituted mistreatment and harassment.  The letter to the credentialing commission "totally shocked and humiliated" Okorie.  The repeated demands for the return of LAUSD computers "humiliated and embarrassed" Okorie and compelled him to complain about Jackson's communicative conduct to her superiors and to other administrative staff. The questioning of Okorie about the then-recent Ebola outbreak in West Africa by one of the officers' serving the subpoena "further humiliated" Okorie.[9]

---

[9] Okorie's feelings of humiliation were not confined to Defendants' statements made during the postinvestigation period, but included statements that preceded the investigation.  According to the complaint, Okorie was

28

In contrast, the complaint does not expressly allege that Okorie was humiliated by the arguably unprotected decisions taken by LAUSD. For example, Plaintiffs did not allege that the primary source of the alleged discrimination against Okorie was his reassignment from his classroom to his home following LAUSD's notification to him of the molestation allegation. Nor did Plaintiffs expressly allege that the principal discriminatory act against Okorie was his subsequent reassignment from his home to ESC, the so-called teacher's jail. The gravamen of Plaintiffs' theory is discrimination via humiliation; that theory of humiliation is meaningless outside the context of the protected speech to which anti-SLAPP protection applies.

In short, it is plain from Plaintiffs' allegations that Defendants' speech and communicative conduct regarding the investigation are not incidental to—but integral to—Plaintiffs' complaint and each cause of action alleged therein. Indeed, the principal thrust or gravamen of Plaintiffs' complaint and its component causes of action is protected speech or communicative conduct. Accordingly, we hold that Defendants have met their threshold burden of showing that Plaintiffs' claims arose out of protected activity that is not incidental to the claim. (*Baral, supra,* 1 Cal.5th at p. 396.)

---

shocked and humiliated by Hughes's observation about the difference between corporal punishment practices in California and in Africa.

29

## III. Plaintiffs did not show a probability of prevailing on their claims

Plaintiffs concede that the court did not err in striking some of their claims (gender discrimination, retaliation, and defamation). This concession, however, does not save their remaining claims (discrimination based on race and national origin; failure to prevent discrimination; intentional infliction of emotional distress; racial/national origin harassment; and violation of title 42 United States Code section 1983), because Plaintiffs failed to meet their burden of showing a probability of prevailing on any of those claims.

A.    PLAINTIFFS' RACE AND NATIONAL ORIGIN DISCRIMINATION CLAIM

Although the specific elements necessary to establish a prima facie case for racial discrimination may vary depending on the underlying facts, "[g]enerally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355; *Horne v. District Council 16 Internat. Union of Painters & Allied Trades* (2015) 234 Cal.App.4th 524, 533.)

Plaintiffs failed to provide any admissible evidence showing discriminatory animus by the Defendants. The declarations attesting to Okorie's character and his

30

dedication as a teacher are, as the trial court correctly concluded, irrelevant—they do not provide any evidence regarding, let alone substantiating, Defendants' alleged misconduct. The only evidence proffered by Plaintiffs to support their claims against Defendants is Okorie's uncorroborated and self-serving declaration. The extent of Plaintiffs' evidentiary failure is puzzling in light of the complaint's allegations. For example, Plaintiffs allege that there were witnesses to much of Hughes's misconduct prior to the molestation investigation—other teachers, school staff and administrators, and students. However, Plaintiffs failed to submit a single declaration from any of these potential witnesses.

In short, Okorie's subjective beliefs regarding Defendants' conduct are not sufficient to meet Plaintiffs' " 'summary-judgment-like' " evidentiary burden. (*Baral*, *supra*, 1 Cal.5th at p. 384; see *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 ["uncorroborated and self-serving declarations" insufficient].) Plaintiffs' evidentiary failure is especially conspicuous in light of the very reasonable, nondiscriminatory justifications that the Defendants proffered for their challenged conduct. Accordingly, we hold that Plaintiffs failed to demonstrate a likelihood of prevailing on their race/national origin discrimination claim.

31

B. PLAINTIFFS' FAILURE TO PREVENT DISCRIMINATION CLAIM

A failure to prevent discrimination claim is a derivative claim—a plaintiff cannot maintain a cause of action for failure to investigate or prevent harassment unless there was actionable harassment. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289; *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1313–1314.) Plaintiffs' failure to provide the necessary evidence to support their discrimination claim necessarily dooms their failure to prevent discrimination claim.

C. PLAINTIFFS' INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

A claim for intentional infliction of emotional distress has the following elements: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) severe emotional distress suffered by the plaintiff; and (3) actual and proximate causation. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.) A defendant's conduct is extreme and outrageous when it is "so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' " (*Id.* at p. 1051.) " '[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' " do not constitute extreme and outrageous conduct. (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496, italics omitted.) Instead " '[t]he requirements [for establishing actionable conduct] are rigorous, and difficult to

32

satisfy . . . .' [Citations.] [¶] On the spectrum of offensive conduct, outrageous conduct is that which is the most extremely offensive. Depending on the idiosyncrasies of the plaintiff, offensive conduct which falls along the remainder of the spectrum may be irritating, insulting or even distressing but it is not actionable and must simply be endured without resort to legal redress." (*Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1129.)

On appeal, Plaintiffs contend that they established a probability of success on their emotional distress claim based on the evidence supporting their race and national origin discrimination claim. However, as discussed above, Plaintiffs failed to provide any evidence of Defendants' discriminatory animus besides Okorie's self-serving declaration. By extension, Plaintiffs have similarly failed to show any evidence of intentional conduct by Defendants that was designed to inflict emotional distress. Accordingly, we hold that Plaintiffs failed to demonstrate a likelihood of prevailing on their emotional distress claim.

D.    PLAINTIFFS' RACIAL AND NATIONAL ORIGIN HARASSMENT CLAIM

In order to prevail on their harassment claim, Plaintiffs were required to show that the actions complained of were motivated by a discriminatory purpose against Okorie because of his protected status. (*Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 76.) Plaintiffs' harassment claim does not survive for the same reasons that their discrimination claim fails—the absence of any admissible

33

evidence showing a discriminatory animus or purpose on the part of the Defendants.

E.     PLAINTIFFS' FEDERAL CIVIL RIGHTS CLAIM

With regard to Plaintiffs' federal civil rights claim, which was based on the execution of the October 2014 search warrant, Plaintiffs concede in their appellate briefing that this claim was fatally flawed as alleged because it was brought against LAUSD only, which is immune under the 11th Amendment of the federal constitution.  (See, e.g., *Kirchmann v. Lake Elsinore Unified School Dist.* (2000) 83 Cal.App.4th 1098, 1115 [California school district as "arm of the state" not subject to liability under § 1983 claim]; *McAllister v. Los Angeles Unified School Dist.* (2013) 216 Cal,.App.4th 1198, 1207 [same];  see also *Belanger v. Madera Unified School Dist.* (9th Cir. 1992) 963 F.2d 248, 254 (9th Cir. 1992); *Aldana v. Los Angeles Unified School Dist.* (C.D.Cal., Nov. 3, 2011, No. CV 10-6000-DOC SP) 2011 U.S.Dist. Lexis 138445, at pp. *9, *13.)  Despite this concession, Plaintiffs argued that the trial court erred by striking that cause of action because they would have been able to name individual defendants with regard to the execution of the subpoena in an amended complaint following discovery.  Plaintiffs' argument is without merit.

Whether Plaintiffs could have filed an amended complaint that could have successfully identified individual defendants against whom the federal civil rights claim could have been asserted is a question that we cannot consider.

Under the anti-SLAPP analysis, we, like the trial court, must take the challenged pleading as we find it.

The anti-SLAPP statute was enacted to purge meritless lawsuits and to do so at an early stage of the litigation. (§ 425.16, subd. (a); *Sylmar Air Conditioning v. Pueblo Contracting Services., Inc.* (2004) 122 Cal.App.4th 1049, 1055–1056.) Accordingly, if a trial court grants an anti-SLAPP motion, it results in a judgment striking the complaint or cause of action. Importantly, if the motion is granted, the court may not grant leave to amend to allege new facts demonstrating the complaint is not subject to the anti-SLAPP statute. (*Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073; *Schaffer v. City & County of San Francisco* (2008) 168 Cal.App.4th 992, 1005.)

Indeed, a trial court cannot even allow an amendment after a defendant has met its burden with respect to the first prong (see *Mobile Medical Services etc. v. Rajaram* (2015) 241 Cal.App.4th 164, 171 (*Mobile Medical*)) or before the hearing on the motion (see *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1280), because such action would undermine the purpose of the statute—that is, providing a "quick and inexpensive method of unmasking and dismissing [meritless] suits." (*Simmons v. Allstate Ins. Co., supra*, 92 Cal.App.4th at p. 1074.)

"Allowing an amendment 'once the court finds the [defendant's] prima facie showing has been met would completely undermine the statute by providing the pleader a ready escape from section 425.16's quick dismissal remedy.

35

Instead of having to show a probability of success on the merits, the SLAPP plaintiff would be able to go back to the drawing board with a second opportunity to disguise the vexatious nature of the suit through more artful pleading.' " (*Mobile Medical*, *supra*, 241 Cal.App.4th at p. 171.)

## IV.    Plaintiffs forfeited their argument about the trial court's evidentiary rulings

Plaintiffs also contend that the trial court's rulings on their evidentiary objections to the Metcalf declaration were "in error." (Capitalization omitted.) Plaintiffs' argument, such as it is, suffers from two fatal procedural defects—it fails to identify which evidentiary rulings were purportedly made in error and fails to offer any legal argument in support of the claims of error. Plaintiffs simply request that we "review the evidentiary rulings."

A touchstone legal principle governing appeals is that "the trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited. [Citations.] [¶] It is the appellant's responsibility to support claims of error with citation and authority; this court is not obligated to perform that function on the appellant's behalf." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656.) "[A]n appellant must present argument and authorities on each point to which error is asserted or else the issue is waived." (*Kurinij v. Hanna & Morton* (1997) 55

36

Cal.App.4th 853, 867.) Matters not properly raised or that are lacking in adequate legal discussion will be deemed forfeited. (*Keyes*, at pp. 655–656.)

In other words, it is not this court's role to construct theories or arguments that would undermine the judgment and defeat the presumption of correctness. Rather, an appellant is required to present a cognizable legal argument in support of reversal of the judgment. "When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary." (*Landry v. Berryessa Union School Dist*. (1995) 39 Cal.App.4th 691, 699–700.) "Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, [they are] waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.) Further, an appellant is required to explain the relevance of facts cited in his or her brief. This court is not " "'obligate[d] . . . to cull the record for the benefit of the appellant." ' " (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455.)

Plaintiffs have failed utterly to support their claim of error with respect to the trial court's evidentiary rulings on the Metcalf declaration, thereby forfeiting their claim. Accordingly, we decline to consider it.

## DISPOSITION

The order is affirmed.  The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


I concur:


CHANEY, J.

ROTHSCHILD, P. J., concurring and dissenting:

In its anti-SLAPP motion, the LAUSD asserted that when, as here, the plaintiff alleges a cause of action that includes allegations of activity that is protected under the anti-SLAPP statute and activity that is not protected—a "mixed" cause of action—the entire cause of action may be subject to the anti-SLAPP statute. According to the LAUSD, the inquiry regarding mixed causes of action is "whether the gravamen or principal thrust of the claim is protected activity." So long as the "primary activity" alleged in a cause of action is protected, the LAUSD argued, the cause of action was subject to the anti-SLAPP statute.

The trial court acknowledged a split among the courts of appeal regarding the anti-SLAPP analysis of mixed causes of action, and agreed with the LAUSD's gravamen theory and analysis. Relying on our decision in *Baral v. Schnitt* (2015) 233 Cal.App.4th 1423, revd. (2016) 1 Cal.5th 376, the trial court explained that "the anti-SLAPP statute does not empower a trial court to strike portions of a cause of action where allegations of mixed conduct are alleged."

While this appeal was pending, our Supreme Court reversed our *Baral* decision (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 397 (*Baral*)), and with it the trial court's rationale in this case. Although the anti-SLAPP statute refers to striking a "cause of action," the Supreme Court explained that, for purposes of the anti-SLAPP statute, a cause of action is not determined by how the plaintiff organized the pleading. (*Id.* at pp. 392-395.) Rather, the phrase refers to "*particular* alleged acts giving rise to a claim for relief." (*Id.* at p. 395.) Thus, a pleaded count, though labeled a "cause of action" in a complaint, may contain numerous claims for relief, each defined by a particular act by the defendant.

In cases involving allegations of both protected and unprotected activity, the anti-SLAPP statute applies to those claims arising from protected activity and does not apply to claims arising from unprotected activity, regardless of whether they are conjoined under a single heading in the complaint.

After *Baral*, the so-called mixed cause of action is not a useful designation now. The phrase previously had meaning only because courts erroneously viewed a cause of action for purposes of the anti-SLAPP statutes as framed by the form of the pleading, and the plaintiff could organize different claims for relief under a single "cause of action" in a complaint. Under *Baral*, however, multiple claims within a pleaded cause of action are separated according to their factual bases and individually analyzed as protected or unprotected claims .

Because *Baral* has eliminated the mixed cause of action problem by redefining a cause of action for purposes of the anti-SLAPP statute, there is no point to ascertaining the gravamen of a mixed cause of action; the "*particular* alleged acts giving rise to a claim for relief" are either protected or not. Although, as *Baral* pointed out, a court may need to determine whether factual allegations are incidental to a claim that arises from protected or unprotected activity, determining the gravamen has no place in anti-SLAPP analysis. (See *Sheley v. Harrop* (2017) 9 Cal.App.4th 1147, 1169 ["After *Baral*, when deciding whether claims based on protected activity arise out of protected activity we do not look for an overall or gestalt 'primary thrust' or 'gravamen' of the complaint or even a cause of action as pleaded"].) Accordingly, I disagree with the majority's holding that "the principal thrust/gravamen analysis remains a viable tool by which to assess whether a plaintiff's claim arises out of protected activity." (Maj. opn. *ante*, at p. 18.)

Here, the LAUSD, moved to strike the entire complaint based on its characterizations of the gravamen of the pleaded causes of action—an analysis the trial court adopted.  Although Okorie has alleged claims arising from protected activity, such as claims arising from statements made in connection with the school district's investigation into molestation allegations, Okorie has also alleged unprotected activity supporting at least some of his claims.  At a minimum, the LAUSD's reassignment of Okorie to his home and, later, to another facility known as "teacher jail"—acts that allegedly constitute adverse employment actions and support his claims for discrimination, harassment, and retaliation—do not constitute protected activity.  (See *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1068.)  It was therefore error to strike the entire complaint.

Accordingly, I respectfully dissent.


ROTHSCHILD, P. J.

3