Filed 1/11/21  Levy v. Murray CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MELODEE EVA-ZACCHARA LEVY, | D076603 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 19FDV03142N) |
| SEAN MATTHEW MURRAY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Cynthia A. Freeland, Judge.  Affirmed.

James W. Denison for Defendant and Appellant.

Castleton Law Group and James B. Green for Plaintiff and Respondent.

Melodee Eva-Zacchara Levy filed a DV-100 petition for a domestic violence restraining order under the Domestic Violence Protection Act (DVPA) against Sean Matthew Murray, based on conduct she alleged occurred between August 8, 2017 and June 15, 2019.  Among other allegations of harassing behavior, Levy alleged Murray filed a civil lawsuit to harass her, and she alleged his behavior at her work after the process server

formally served her also was harassing. Murray responded to Levy's request for a restraining order with an anti-SLAPP motion. (Code of Civ. Proc.,[1] § 425.16.) In it, he asked the court to strike allegations pertaining to his lawsuit and its service as conduct protected by the litigation privilege. The court struck allegations regarding the filing of the civil lawsuit, but it concluded Levy had established a probability she would prevail on the claim regarding Murray's alleged behavior after service of process occurred, and the court denied his request to strike those allegations. On appeal, Murray contends the trial court erred by concluding Levy had met her prima facie burden on the second prong of the anti-SLAPP analysis, and he asks us to reverse the trial court's conclusion regarding the events of June 15, 2019.

We conclude Murray's actions on June 15, 2019 did not constitute protected conduct; thus, the court properly denied the motion to strike as to those allegations. Further, even if Murray's conduct were somehow unprivileged, protected activity, Levy would have met her prima facie burden of demonstrating a probability of success. Accordingly, we will affirm the trial court's order, which struck allegations regarding the filing and service of Murray's civil suit but did not strike allegations of Murray's behavior the night Levy was served.

I

FACTUAL AND PROCEDURAL BACKGROUND[2]

On May 3, 2019, Murray filed a lawsuit against Levy and her housemate Cody Powers alleging defamation and intentional infliction of

---

[1]    Further section references are to the Code of Civil Procedure, unless otherwise specified.

[2]    Murray filed a request for judicial notice February 25, 2020, which we grant.

2

emotional distress. That complaint alleged Levy forged a police report and shared the forged document, which contained allegedly defamatory statements about Murray, with third parties. Murray attempted to serve Levy at the address he had for her residence, but the male occupant who answered the door said she did not reside there. A private investigator located a private postal mail box in Levy's name, and the summons and complaint were mailed to that address with a notice and acknowledgement of receipt form dated May 17, 2019. Levy did not accept service by mail.

On June 15, 2019, while Levy was working a venue as a disc jockey (DJ), a service provider formally served the summons and complaint from Murray's lawsuit. The process server approached Levy around 10:00 p.m. that evening and asked if she was Levy; when she responded she was, he handed her the papers. She recognized the documents as related to a lawsuit.

Levy filed her answer July 16, 2019.

On July 22, 2019, Levy filed a separate lawsuit, a request for a domestic violence restraining order. In Levy's attached declaration, she alleged Murray had been harassing her since 2017. She alleged that on August 8, 2017, she told Murray she wanted to end the relationship and asked Murray to take her to the nearest train station so she could leave. Murray refused to allow her to leave his home from 9:00 a.m. until 5:00 p.m. She further alleged that during that time, he prevented her from eating in the kitchen, and he kept the residence temperature high despite knowing Levy was medically sensitive to extreme heat. The hunger and heat made her too weak to fight her way out of Murray's home.

Her declaration further alleged that around 5:00 p.m. that evening, Murray took Levy to get food and drove erratically while doing so. Though

3

Levy requested a ride to the train station, from where she planned to get an Uber lift to her home, Murray insisted she ride with him; he told her to get in his car or he would leave with her belongings, and he threatened to run over her. Levy alleged that Murray began to back up the car while Levy was standing behind it, so she climbed inside. In an effort to appease Murray, Levy told him they could stay in the relationship, but she wanted to be driven to the train station anyway.

Once they arrived at the train station, she attempted to exit the vehicle, but Murray began driving away, toward Levy's home. She begged Murray to stop the vehicle, but he continued to drive erratically, weaving in and out of traffic. When Levy attempted to dial 911, Murray grabbed away her phone, so she opened her window and began screaming, "Call 911!" Murray slapped her in the face. At one point, Murray slowed down when they reached a light, and Levy tried to jump out of the vehicle, but Murray sped up so that she could not. Levy alleged this happened twice more during their travels.

Once they reached Levy's home, she alleged Murray grabbed her purse, which also contained her keys. Levy ran to the house, banged on the front door, and told her housemate Cody Powers to call 911. Powers let Levy inside and called 911.

Murray threw Levy's belongings from the vehicle, but he kept her purse, and she alleged he drove in circles, held up his middle finger, and screamed, "Die, you b*tch." Murray drove away then, but he returned and threw a stuffed animal at Powers's truck, then revved his engine and drove off.

Levy alleged that when police finally arrived, they recommended she file a report and seek a restraining order, but she declined because she feared retaliation from Murray.

In March 2018, Levy ended the relationship with Murray. She alleged she received a text message from Murray on April 2, 2018 asking if Levy had blocked him. She discovered a picture she had never seen before on her phone, and when she attempted to access applications on her phone, Levy noticed they seemed to have been changed. Levy believed Murray had hacked her phone because, she alleged, he had a history as a hacker, had knowledge of computers, and because of the picture she received. Levy responded by changing her phone number and blocking Murray on that number, as well as on all her social media accounts.

In September 2018, Murray began contacting Levy using her Google voicemail number. He started out by contacting her once or twice a day, but that escalated to 10 to 30 times daily. She recognized Murray as the caller, and she blocked him through Google voice. Murray also attempted to contact Levy using his grandmother's number, so she blocked that number as well.

Additionally, Murray contacted Levy through social media by creating additional Instagram accounts and sending her private messages to her personal and business accounts. As she blocked accounts he was using, he created new ones or found different platforms to use.

Next, Levy alleged she discovered her name had been published on STDregistry.com and DatingPsychos.com, which identified her using personal information and made disparaging comments, including posting about her under "Chlamydia files." Levy alleged the information was false and contained personal information few people knew, like her surname at birth. Levy said she filed a police report with the Oceanside Police Department.

In her declaration, Levy stated that on January 9, 2019, Murray, who was living in Massachusetts by then, contacted her through Instagram and threatened suicide. Levy contacted local police and asked them to conduct a welfare check. She learned later that Murray had been taken to the ER and released.

On January 10, 2019, Murray sent Levy flowers at a show where she was performing in Los Angeles.

On January 11, 2019, Levy received a text from an unknown number that she believed belonged to Murray.

On January 13, 2019, Murray sent Levy several messages through SoundCloud, a website where Levy uploads DJ mixes. One message indicated Murray was ready to move on and asked to talk, so Levy unblocked Murray long enough to talk. Levy alleged that during that conversation, Murray indicated he was hopeful the two could have a future together, and he admitted he created various Instagram accounts as a means to contact Levy. Levy told Murray she did not want to be in regular contact with him.

On January 25, 2019, Levy received a message from an anonymous account, which Levy believed belonged to Murray; the person admitted to abusing her.

Murray mailed Levy a book about borderline personality disorder. Enclosed was a note from Murray asking her to accept the book as a way to learn about his mental illness and expressing his hope she had not given up on him. Levy told Murray she did not want the book and that their relationship was over.

That same day, Murray's friend Ashley Sayre de Rivas reached out to Levy via text on behalf of Murray. Levy also alleged that Murray contacted her from a different account threatening to "degrade" her DJ name.

6

On January 26, 2019, Murray filed two Digital Millennium Copyright Act (DMCA) violation notices against Levy for work uploaded to SoundCloud and Mixcloud, claiming ownership of the uploaded music mixes. Levy alleged she had full ownership over the work because Murray had previously signed over the rights to her, but because of his claims, the mixes were removed from the websites. Levy alleged this negatively affected her DJ business.

On January 29, 2019, Levy hired attorneys and began gathering materials to file petition for a restraining order.

On April 7, 2019, Levy discovered a profile had been created using her hashtag #badmoonkitty. She alleged the new profile contained the hashtag #switchbait and it had four photos posted to the profile, three of Levy and Powers. Levy identified the photos as coming from a deactivated Facebook account, a 2018 Instagram story, and a private text to Murray; she believed Murray created the profile. Levy alleged that she reported that incident to the police.

On April 14, 2019, Levy received an automated message from a five-digit Amazon short-code number that said "Tock," then "Tick tock." Because Murray worked as an Amazon software developer at the time, Levy believed the message came from him.

Levy also alleged that Murray's May 3, 2019 lawsuit was filed as a means to harass her. She further alleged that on June 15, 2019, Murray flew to California, wore a ski mask, and ran into a club where she was DJ-ing to serve her notice of the lawsuit. More specifically, she explained she saw a man in a ski mask take a picture of her with the flash. He removed the mask to reveal it was Murray, then flipped off Levy and said, "Fuck you, Bitch!" He replaced the ski mask and began running through the venue. Levy asked her promoter for help, and when the promoter and club bouncers asked Murray

to leave, Murray hid in the women's bathroom. Finally, around 10:50 p.m., Murray and a couple friends, all dressed in black, were escorted from the venue. Levy said she observed Murray being hostile with bouncers, initially refusing to leave, and she went to the front door where she saw Murray and his friends walk away.

Levy expressed fear that Murray would continue to show up where she was and would continue to contact her and to threaten her.

Murray responded to the request with an anti-SLAPP motion, filed August 7, 2019. In it, he asked the court to strike the allegations of alleged harassment on pages 9 and 10 of Levy's declaration "based on Respondent's previously having filed and ser[v]ed a lawsuit against Petitioner" because, he argued, they were based on protected activity. Murray also filed objections to Levy's declaration.

Along with his anti-SLAPP motion, Murray filed several declarations, including his own, and those painted a different picture of what had occurred both during his relationship with Levy and at the venue where Levy was served. The declarations confirmed a process server served Levy with the paperwork for the lawsuit Murray filed and confirmed Murray's presence at the venue during and after service. While the remaining information provides some context for why Murray filed suit against Levy, we do not restate that information here because we are not called to make factual determinations at this stage of the proceedings (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384-385 (*Baral*)), and much of the evidence submitted by Murray creates factual conflicts most appropriately evaluated by the trial court in reviewing the underlying petition for a DVPA restraining order.

The trial court, in its findings and order after hearing, concluded that the litigation privilege would preclude a claim based on the filing and service

of a lawsuit per se if that were the primary basis of the request for the restraining order. However, the court concluded that the conduct upon which Levy sought relief was not the lawsuit and its service, but was instead Murray "running around the venue in [a] mask[ ] and generally being belligerent," which it concluded was not "necessarily related to the service of the civil lawsuit" and it accordingly denied the motion to strike the petition for the domestic violence restraining order. The trial court did, however, strike the sentence at page 9, lines 12 through 13 of Levy's declaration, which read, "I believe that Sean has only filed this suit to continue harassing me." The court also struck the following sentence from page 10, lines 18 through 19: "Sean had apparently resorted to using the legal system to harass me."

Murray timely appealed.

## II

## DISCUSSION

### A. *Anti-SLAPP Law*

"A SLAPP suit is a 'meritless lawsuit "filed primarily to chill the defendant's exercise of First Amendment rights." ' [Citation.] California's anti-SLAPP statute allows a defendant to move to dismiss 'certain unmeritorious claims that are brought to thwart constitutionally protected speech or petitioning activity.' [Citation.]" (*Medical Marijuana, Inc. v. ProjectCBD.com* (2016) 6 Cal.App.5th 602, 613.) The anti-SLAPP statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United State Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court

determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

A court conducts a two-step analysis when ruling on a special motion to strike under the anti-SLAPP statutory framework. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16 [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral*, *supra*, 1 Cal.5th at p. 384.)

To make a showing under the first prong, a defendant need only establish a prima facie case that his alleged actions fell into one of the categories listed in section 425.16, subdivision (e). (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 314 (*Flatley*).) He may do so by identifying the allegations of protected activity from the complaint and the claims for relief supported by them. (See *Baral*, *supra*, 1 Cal.5th at p. 396.)

In cases involving allegations of both protected and unprotected activity, a plaintiff must establish a probability of prevailing on any claim for relief based on the allegations of protected activity, and if the plaintiff does not do so, that claim and its corresponding allegations must be stricken. (*Baral*, *supra*, 1 Cal.5th at p. 395.) The Supreme Court has described the process in cases in which both protected and unprotected conduct is alleged as a basis for the cause of action as follows:

> "At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the

10

plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Id*. at p. 396.)

"*Baral* adopted a permissive approach: 'the Legislature's choice of the term 'motion to strike' reflects the understanding that an anti-SLAPP motion, like a conventional motion to strike, *may* be used to attack part of a count as pleaded.' [Citation.]" (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 589, quoting *Baral*, *supra*, 1 Cal.5th at p. 393.) Thus, an anti-SLAPP motion may be used to "attack an entire pleading, such as a complaint, and various subparts of a pleading, such as the cause of action or pleaded count, as well as component paragraphs, words or phrases." (*Okorie*, at p. 589.)

We review anti-SLAPP motions de novo. (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 727 (*Freeman*).) We consider the pleadings and supporting and opposing affidavits, " ' "accept[ing] as true the evidence favorable to the plaintiff [citation] and evaluat[ing] the defendant's evidence only to determine if it has defeated that submitted by plaintiff as a matter of law." ' " (*Ibid.*) We "do[ ] not weigh evidence or resolve conflicting factual claims. [Our] inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral*, *supra*, 1 Cal.5th at pp. 384-385.)

B. *Whether the Challenged Allegations Regard Protected Conduct*

11

The first prong places the burden on the defendant to identify allegations of protected activity, along with the claims for relief they support. (*Baral*, *supra*, 1 Cal.5th at p. 396.) Murray's anti-SLAPP motion asked the trial court to strike the allegations of alleged harassment on pages 9 and 10 of Levy's declaration "based on Respondent's previously having filed and ser[v]ed a lawsuit against Petitioner."

Protected activity includes an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' . . . " Such speech includes "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) However, protected activity that is insignificant to a claim, or merely incidental, is not subject to the anti-SLAPP statute. (See *Baral*, *supra*, 1 Cal.5th at p. 394.)

The allegations on pages 9 and 10 begin with the heading "Sean's Civil Lawsuit Against Me." The first five lines of the section allege Murray filed a civil lawsuit against Levy and identify the factual basis for that suit. Next, Levy alleges the series of events that occurred while she was working as a DJ on June 15, 2019. Within that description, Levy explains a man approached her, asked if she was "Melodee," and handed her papers, which she recognized as relating to Murray's lawsuit against her. The remainder of page 9 describes Murray's alleged behavior the night of June 15, 2019.

Page 10 of Levy's declaration includes two statements about Murray's lawsuit. She states that he "filed a civil lawsuit against me and flew to California, wore a ski mask and ran to a club I was DJ-ing at to serve me." She also alleges, "Sean had apparently resorted to using the legal system to harass me." The remaining allegations on page 10 address Murray

12

contacting a mutual friend, Levy's attempts at blocking Murray's attempts at contacting her through Google voice and social media, DCMA claims made to online service providers to have Levy's music removed, and Levy's efforts to avoid contact with Murray.

It is clear that some of these allegations identify protected conduct as the basis for Levy's request for a domestic violence restraining order, namely Murray's filing of a civil lawsuit. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 90 (*Navellier*).)  The court previously struck those allegations, and that portion of the order is not challenged.  Thus, we focus on whether Murray's behavior on June 15, 2019 is protected conduct under the anti-SLAPP statute.

Service of process is conduct undertaken "in furtherance of the exercise of the constitutional right of petition" (§ 425.16, subd. (e)(4)) because serving the lawsuit is a necessary step to in litigation.  (§ 583.210 [service required within three years]; § 583.250 [mandatory dismissal if summons and complaint not served within the prescribed time]; see *Greene v. Lindsey* (1982) 456 U.S. 444, 450-451 [service of summons constitutionally required to provide notice of lawsuit to defendant].)  At issue is whether Murray's presence at the service of process of the lawsuit he filed is appropriately considered part of its service.  Murray contends his presence is protected conduct under the litigation privilege because, he argues, it was "logically connected" to service and therefore also "in furtherance" of his right to petition.  Levy argues Murray's presence was collateral to and not logically related to service.

The litigation privilege protects any publication or broadcast made in a judicial proceeding.  (Civil Code, § 47, subd. (b).)  It extends to "any publication required or permitted by law in the course of a judicial proceeding

13

to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved. [Citations.] [¶] The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. [Citations.]" (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.) It applies to a communication made by noncommunicative acts that are "necessarily related" to a communicative act, and it may extend to steps taken prior to trial or other proceedings. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1052, 1057.) The litigation privilege applies broadly. (*Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 212 (*Finton*).) Murray's theory is that whether or not his presence was legally required, because he was at the venue to aid the process server, his conduct, like service of process, is covered by the litigation privilege and therefore protected conduct under the anti-SLAPP statute. We disagree.

Murray's presence and participation in service of process was not necessary here.[3] Although there is evidence in the record to suggest Levy had avoided or refused service, there is nothing that indicates Murray's

_____

[3]     Process must be served by a nonparty to the lawsuit. (§ 414.10) As the complaining party, Murray could not serve Levy's papers. (*Ibid.*) Murray asks us not to consider Levy's new claim on appeal that Murray's presence at the service of process was illegal and therefore was not a proper basis for a motion to strike. (See, e.g., *Flatley*, *supra*, 39 Cal.4th at pp. 332-333 [concluding extortion was not constitutionally protected activity for purposes of section 425.16 and could not properly form the basis of a motion to strike].) We do not view the issue before us as whether the presence of a party invalidates service of process or is in some way unlawful. Instead, we ask whether the party's presence is logically connected to service so that his presence becomes protected by the litigation privilege.

personal presence was necessary to effectuate service. Levy had advertised herself as the person DJ-ing the event, so the process server could locate her. Moreover, by all accounts, when the process server asked, Levy confirmed her identification. Murray also does not explain why the process server's affidavit and proof of personal service would not have been sufficient evidence of completion of service in the event that Levy denied receipt. Even if that were the concern, he does not explain why he personally needed to be there; he could have provided the process server with a photograph of Levy, and the declarations show that Murray had friends who could independently identify Levy, at least one of whom lived not far from the venue. These friends were present, suggesting Murray's personal presence was not required, even if some sort of identification were necessary.

Murray argues his behavior in connection with the service is irrelevant to the determination that it is protected conduct because the litigation privilege is applied broadly. He cites several cases in which the litigation privilege has been applied to unlawful conduct taken in anticipation of litigation, including illegal gathering of evidence in preparation for litigation. (See *Finton*, *supra*, 238 Cal.App.4th at p. 212; *Scalzo v. Baker* (2010) 185 Cal.App.4th 91, 102.) However, those cases are distinguishable because there the activity was undertaken directly for the purpose of the litigation in that the materials gathered were for potential use in lawsuits. Here, in contrast, nothing about the service of process itself is connected to the actual suit, which would be able to continue in substantively the same manner even if Murray had not been present June 15, 2019. We fail to see how flying across the country, appearing at Levy's place of work in a ski mask, shouting a profanity, and being ejected by bouncers for refusing to leave fairly can be characterized as logically related to service or in its furtherance, particularly

15

because those acts were not undertaken by the process server. Murray's presence did not further the litigation in any way.[4]

Thus, while we agree that the service itself was protected conduct, Murray's conduct that evening was not. And because Murray's alleged behavior during and after the process server's engagement in those duties is not protected activity, we do not reach the second prong of the analysis with respect to those allegations. (See *Baral, supra,* 1 Cal.5 at p. 396 [disregard unprotected activities; if relief sought is based on protected activity, second stage of analysis reached].)

C. *Likelihood of Success*

Murray contends that the allegations regarding his conduct on June 15, 2019 do not show a probability of success on the merits for the same reason those allegations regard protected activity: the litigation privilege. His main argument is that because his actions were privileged, none of them can be

---

[4] We also find Murray's reliance *Kenne v. Stennis* (2014) 230 Cal.App.4th 953 unhelpful to the situation before us. In *Kenne,* the process server was an employee of the plaintiff, who herself was present when the service occurred. (*Id.* at p. 958.) In response to the process server's attempt at service, the defendant refused to receive the documents, shouted obscenities, and threw the papers through a car window at the process server, then called the police and subsequently filed false police reports against the plaintiff. (*Id.* at pp. 958-961.) After the defendant used the false police reports in two civil harassment lawsuits against the plaintiff, the plaintiff sued the defendant for a variety of torts, including intentional infliction of emotional distress. (*Ibid.*) The appellate court concluded that the plaintiff could not maintain an action against the defendant for emotional distress because all the communications at issue were "during the course of and directly related to judicial proceedings." (*Id.* at p. 971.) The conduct at issue there regarded the defendant, who was a necessary participant in the service of process as recipient of the court documents. In contrast here, Murray's presence was unnecessary. Thus, we cannot conclude his presence after the process server delivered the documents was similarly directly connected to any judicial proceeding.

cited as evidence to support a domestic violence restraining order. As we have already explained, that alleged conduct is not covered by the litigation privilege; thus, its admissibility is not prohibited due to privilege.[5]

Even if Murray's behavior were somehow protected activity despite not being privileged, the outcome would be the same.

To survive anti-SLAPP scrutiny at the second prong, a plaintiff must establish the cause of action has "minimal merit." (*Navellier, supra,* 29 Cal.4th at p. 89.) We assess whether the plaintiff has made a prima facie showing that would warrant the claim moving forward. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 (*HMS Capital, Inc.*); *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [establishment of prima facie case is question of law].) We consider declarations "if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial." (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 949 (*Sweetwater Union High School Dist.*).) Only if the evidence the moving party relies upon cannot be admitted due to a categorial bar or because some undisputed factual circumstance shows it is not admissible do we disregard the evidence presented. (*Ibid.*)

To support a claim for a DVPA restraining order, a plaintiff must present "reasonable proof of past act or acts of abuse." (Fam. Code, § 6300.) "Abuse" includes any behavior that can be enjoined pursuant to Family Code section 6320 (Fam. Code, § 6203, subd. (a) ), which includes "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering . . . ,

---

[5] The trial court similarly concluded the service of the complaint is not conduct upon which Levy sought relief. The trial court then considered whether the remaining, unprotected conduct satisfied Levy's burden of a prima facie showing sufficient to sustain a favorable judgment and concluded, as we do, that she has.

harassing, telephoning . . . contacting, either directly or indirectly, by mail or otherwise . . . disturbing the peace of the other party" (Fam. Code, § 6320, subd. (a)). Abuse under the DVPA includes acts that "destroy[ ] the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497.)

Murray argues the trial court erred because it did not consider Murray's alleged conduct on the night of June 15, 2019 in isolation from all the other alleged conduct that Levy's declaration indicates is part of a pattern of harassment. But courts can issue restraining orders under the DVPA for harassment, unwanted contact, and disturbing the peace based on a pattern of conduct. (See Fam. Code, § 6300, subd. (a); *In re Marriage of Ankola* (2020) 53 Cal.App.5th 369, 381 [unwanted contact in e-mails and repeated telephone calls[6]]; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1146-1147 (*Burquet*) [ongoing electronic and in-person contact]; *Sabato v. Brooks* (2015) 242 Cal.App.4th 715, 721-722, 725 (*Sabato*) [frequent mail, e-mail, text message, and telephone contact].) Levy similarly seeks a restraining order based on Murray's alleged ongoing behavior rather than a single incident.

Murray argues that the procedure outlined by *Baral* requires us to evaluate whether the claim supported by protected activity is legally sufficient and factually substantiated absent consideration of unprotected activity. If we were to consider only Levy's allegations regarding Murray's behavior on June 15, 2019 as evidence to support her request for a

---

6      The court here also separately based its decision on stalking because the husband secretly moved into an adjacent apartment. (*In re Marriage of Ankola*, at pp. 375, 381.)

18

restraining order, she would meet her prima facie burden.[7] Assuming Levy's allegations to be true as we must (*Baral*, *supra*, 1 Cal.5th at pp. 384-385; *Freeman*, *supra*, 154 Cal.App.4th at p. 727), Murray's behavior and Levy's feelings in response provide sufficient evidence to support a prima facie case that Murray's contact was unwanted, and Levy felt harassed. (See, e.g., *Burquet*, *supra*, 223 Cal.App.4th at pp. 1142-1143 [defendant showed up after five months, unannounced, uninvited, and refused to leave when asked].)

However, Murray's anti-SLAPP motion did not attack the entire legal theory raised by the domestic violence allegations; it attacked references to Murray's lawsuit and its service of process. Moreover, Levy's request for a restraining order is not predicated solely on Murray's behavior June 15, 2019. Accordingly, we consider whether Levy has met her burden by reviewing all the evidence of Murray's alleged conduct. (See, e.g., *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1256 (*Jackson*) [explaining allegations of outrageous behavior that caused severe emotional suffering were part of a

---

[7] In *Murray v. Tran* (2020) 55 Cal.App.5th 10, a panel of this court explained that it was required to consider each category of alleged defamatory statements as a separate claim subject to a motion to strike. (*Id.* at p. 26.) The panel considered each defamatory statement that arose in a discrete circumstance as separately subject to a motion to strike under section 425.16. (*Id.* at p. 26, fn. 4.) Here, we likewise consider Murray's actions on June 15, 2019 as a discrete event. However, unlike defamatory statements, which can be discretely analyzed, as we have explained the DVPA restraining order can be sought based on a pattern of conduct rather than a single or discrete incident. (See Fam. Code, § 6300, subd. (a); *In re Marriage of Ankola*, *supra*, 53 Cal.App.5th at p. 381; *Burquet*, *supra*, 223 Cal.App.4th at pp. 1146-1147; *Sabato*, *supra*, 242 Cal.App.4th at pp. 721-722, 725.)

19

course of conduct, not merely the specific conduct challenged by the anti-SLAPP motion in that case].)[8]

Levy alleged Murray detained her against her will in his home, threatened to back his vehicle over her, refused to allow her to leave his vehicle, hacked her phone, attempted to contact her through a variety of social media accounts when she blocked him, called her 10 to 30 times a day from different phone numbers, published false information about her on dating website, sent her unwanted flowers, accused her of copyright violations to have her music removed from websites, mailed her a book, and asked a friend to contact her on his behalf. Then he showed up at her place of work, on the other side of the country from where he lived, in a ski mask, snapped photograph of her, shouted a profanity, and refused to leave the venue. Taken in the context of the other evidence presented, Murray's alleged conduct on June 15, 2019 was just one more in a long line of alleged acts to harass Levy with unwanted contact, disturbing her peace.

D. *Evidentiary Challenges*

Finally, Murray argues that the court should have granted the anti-SLAPP motion because Levy failed to cite to specific evidence in her papers or at the hearing to support her probable success. It is not clear to us what specific evidence Murray believes is missing. Levy's declaration details the events of that evening, and that declaration is admissible evidence, which, if accepted as true, establishes prima facie evidence of harassment to justify issuance of the restraining order. (*Sweetwater Union High School Dist.*,

---

[8]    Murray argues this case is inapplicable because it did not address the litigation privilege. However, this case is instructive because it demonstrates that when a cause of action is not based on a single act, the court may consider the relevant course of conduct. (See *Jackson*, at p. 1256.)

20

*supra*, 6 Cal.5th at p. 949 [appellate courts consider evidence when it is reasonably possible it will be admissible at trial].)

Further, looking at Murray's actions June 15, 2019 as the continuation of ongoing harassment, there was other evidence in the record as well. Levy's declaration described the events of August 8, 2017. She alleged that in September 2018, Murray began contacting her via Google voice, upwards of 30 times a day; she provided an exhibit to support that allegation, and Murray confirmed calling her repeatedly from more than one phone number. She alleged that Murray contacted her repeatedly through Instagram and other social media by creating new accounts , an allegation confirmed by Murray.[9] She specifically alleged he sent her flowers at a show in January 2019 and had a book mailed to her that month, another allegation Murray confirmed, and Levy alleged Murray had a friend reach out to her on his

---

[9]  Murray's and Sayre de Rivas's declarations offer an alternative to harassment for why Murray repeatedly attempted to contact Levy through a variety of media. However, at this stage of the pleadings, we accept as true all evidence favorable to Levy, and we do not make factual determinations. (*Freeman, supra*, 154 Cal.App.4th at p. 727.) We have no opinion regarding what conclusions the trial court should draw in light of the competing declarations; nor is it our place to opine regarding whether the trial court should issue a domestic violence restraining order under the facts of this case. We only affirm that Levy's allegations regarding Murray's conduct on the evening of June 15, 2019 need not be struck under the anti-SLAPP statute.

behalf because Levy blocked him.  That contact was confirmed by Sayre de Rivas and by some screen shots of their conversation.[10]

Given the record before us, we conclude Levy has established her cause of action has minimal merit to permit her petition to move forward. (*Navellier, supra,* 29 Cal.4th at p. 89; *HMS Capital, Inc., supra,* 118 Cal.App.4th at p. 212.)

---

[10]   Murray comments in his opening brief that he filed line-by-line objections to the majority of Levy's declaration, but he never had the opportunity to address the objections with the court.  Those objections by and large did not regard the evidence pertaining to conduct which Murray challenged as protected under section 425.16.  Because our review is limited to the anti-SLAPP motion and not resolving factual conflicts or determining admissibility of statements contained in the petitioning declaration (*Baral, supra,* 1 Cal.5th at p. 396 [no consideration of factual conflict]; *Sweetwater Union High School Dist., supra,* 6 Cal.5th at p. 949 [consider evidence if it is reasonably possible it will be admissible at trial]), we do not address those objections in this appeal.  Murray can raise those objections with the trial court in connection with the opposition to the petition for a restraining order.

DISPOSITION

The order is affirmed.  Parties to bear their own costs.

HUFFMAN, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.