Filed 4/21/23 In re C.G. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re C.G. et al., Persons Coming Under the Juvenile Court Law. | B321941 |
| _____ | Los Angeles County |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Super. Ct. No. 22CCJP00739A, B |
| Plaintiff and Respondent, | |
| v. | |
| Karla A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge. Affirmed in part and reversed in part.

Suzanne M. Nicholson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court asserted jurisdiction over Karla A.'s two sons under subdivisions (a), (b), and (j) of section 300. We affirm, except that we reverse one finding. Undesignated statutory references are to the Welfare and Institutions Code.

I

Karla A. has two sons: C.G., born in 2012, and M.R., born in 2017. C.G.'s father is Christopher G. M.R.'s father is Martin R.

In early January 2022, M.R.'s paternal grandparents called the police and said the mother left nonverbal, four-year-old M.R. on their doorstep at 8 p.m. without notifying them or ensuring they were home. Eventually the police reached Martin R., M.R.'s father, at work, and Martin R. later retrieved his son from his parents. The Department learned of the incident and interviewed the mother. She explained she had told Martin R. she would be dropping M.R. off at the paternal grandparents: she showed the social worker the text messages in which Martin R. wrote "okay" in response to her message. The mother said she knocked, and the paternal step-grandfather answered the door. She told him Martin R. knew she was dropping M.R. off, and the paternal step-grandfather took M.R. inside. The mother believed the paternal grandmother was making up lies to cause trouble because she does not like the mother. The paternal step-grandfather claimed M.R. was alone when he opened the door, but he had seen a car that looked like the mother's driving around the corner. The paternal grandmother initially said she

2

saw no one, but later changed her story to match the paternal step-grandfather's about the car. The paternal grandparents said they called the police because they could not reach Martin R. and wanted the mother to face consequences for her actions. The paternal grandmother said the mother had done this at least three times before.

Martin R. said the mother often threatened to drop M.R. off, but usually did not, so Martin R. did not believe she was going to follow through on her threat. Martin R. said their text message conversation frustrated him so he had turned his phone off.

Martin R. told the Department that, in the past, the mother had vandalized his car by slashing the tires. He also said the mother had broken into his apartment, left the water on to cause water damage, and stolen his computer. He said she then returned the computer but had changed the password so he could not use it. The mother admitted she vandalized his car and took the computer, but said Martin R. had asked her to set it up for him.

C.G.'s paternal grandmother said the boy C.G. told her his mother had broken Martin R.'s windows and keyed his car. C.G. also said he had seen Martin R. push his mother.

Martin R. said the mother was temperamental and had a temper. He said that, about five years ago, the mother accused him of domestic violence, and he pleaded no contest to avoid going to jail. The mother said Martin R. had been abusive toward her when they were together, including when she was pregnant and once after M.R.'s birth.

C.G.'s paternal grandmother said the mother was hard to deal with but that they had a good relationship. The mother

dropped C.G. off with his paternal grandmother every other weekend for visits. During this time, the paternal grandmother would coordinate calls and/or visits with C.G.'s father, who lived in Las Vegas. Christopher G. told the Department the mother was very abusive towards him. He stated he had obtained a restraining order against her but had been unable to serve her. The mother also evaded service of custody papers. Christopher G. said he and his wife moved to Las Vegas to get away from the mother.

In early February, the mother went to Martin R.'s apartment to drop off M.R. Martin R. let her in the apartment. The mother became upset and began yelling at Martin R. about him liking other women's pictures on Facebook. The mother punched a hole in the bathroom wall. The mother said Martin R. pushed her out of the bathroom and she fell. Martin R. said the mother threatened to call the police and tell them he had hurt her so he would go to jail. Martin R. said he did not push the mother but only argued with her and told her to leave. M.R. was present during the event. The mother and M.R. left; the mother called the police and said Martin R. had dragged her. The police told her to return to Martin R.'s apartment. After initially refusing, the mother did return. She told the police Martin R. had grabbed her and dragged her across the room. The police examined the mother's arm and saw no marks. The mother then said she might have tripped and there had not been a physical altercation and continued to change her story. The police noted in their report it seemed as though the mother might be under the influence, though Martin R. said he did not smell any alcohol, and the mother said she was just emotional. A neighbor said the mother and Martin R. argued, but there was no physical

altercation. The police concluded no crime had occurred. The police informed the Department of the incident.

The Department obtained removal orders detaining the children with their respective fathers. Because Christopher G. was out of state, the Department initially placed C.G. with his paternal grandmother.

The Department filed a petition alleging the court should assert jurisdiction over the children under subdivisions (a), (b), and (j) of section 300. As to subdivision (a), the petition alleged the children were at risk of nonaccidental serious physical injury by a parent because of the mother's "history of violent and assaultive behaviors, in that on prior occasions, the mother has slashed . . . Martin [R.'s] car tires" and "broke into [Martin R.'s] home and left a water faucet on causing water damage to [Martin R.'s] home and stealing [Martin R.'s] computer." The petition listed two allegations under subdivision (b). First, it alleged the mother placed M.R. in a dangerous situation when she left him alone on his paternal grandparents' doorstep without notifying an adult and that this conduct also endangered C.G. Second, it alleged the mother endangered both children due to the same allegations listed in support of subdivision (a). Finally, as to subdivision (j), the petition alleged C.G. was at risk due to the mother's conduct in leaving M.R. alone on his grandparents' doorstep. After a hearing, the juvenile court ordered the children detained from the mother and continued their detention with their respective fathers.

Before the jurisdictional hearing, the Department filed a Jurisdiction/Disposition Report. In the section discussing the evidence supporting the allegations in the petition, the report added facts about the February incident at Martin R.'s apartment

5

in support of the allegations under subdivisions (a) and (b). At the adjudication hearing, the court sustained the petition in its entirety. The court then ordered the children to remain detained with their respective fathers and ordered enhancement services for the mother. The court also ordered monitored visits for the mother.

The mother appealed the jurisdictional and dispositional orders.

## II

We affirm the orders except for the juvenile court's finding of jurisdiction over the children under subdivision (a).

We assume justiciability and reach the merits. (See *In re D.P.* (2023) 14 Cal.5th 266, 286 [it may serve justice to review a parent's appeal "where a parent does not challenge all jurisdictional findings, but only one finding involving particularly severe conduct"].)

Although the mother appeals both the jurisdictional and dispositional orders of the juvenile court, she makes no arguments regarding the disposition. She thus forfeits this issue. (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 599-600.)

We review the jurisdictional findings for substantial evidence. (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602) (*Cole L.*), We independently review any questions of statutory interpretation, including whether alleged conduct can support a jurisdictional finding. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598) (*Giovanni F.*).

## A

We reverse one element of the juvenile court's order because the mother's vandalism, even in the presence of the

6

children, did not put them at risk of suffering a *nonaccidental* injury *at her hands.*

Subdivision (a) applies when the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted *nonaccidentally* upon the child *by the child's parent . . . .*" (§ 300, subd. (a), italics added.)

The petition alleged the mother "has a history of violent and assaultive behaviors, in that on prior occasions, the mother has slashed . . . Martin [R.'s] car tires. On a prior occasion, the mother broke into [Martin R.'s] home and left a water faucet on causing water damage to [Martin R.'s] home and stealing [Martin R.'s] computer." The Department's jurisdiction/disposition report added information about the February incident as "supporting evidence" for the subdivision (a) allegations.

We consider the evidence in the light most favorable to the judgment.

Even so, the record shows the mother had engaged in violent acts only *against property* in the presence of the children. C.G. said he was with the mother when she keyed Martin R.'s car. M.R. was there when the mother punched a hole in the bathroom wall.

The court found the mother used the children as pawns to manipulate the fathers and her acts of vandalism were "designed to intimidate or get some type of benefit from a partner that she is still very frustrated with." The court also found that engaging in vandalism in the presence of the children put them in danger. The court reasoned that a third party, including the owner of the vandalized property, or a bystander, or law enforcement, could become involved, and the situation could spin out of control. In such a scenario, the children could be injured.

7

Vandalizing property in the presence of the children indeed could put them in danger, as we discuss below. But this conduct does not fall under subdivision (a). Two features of this subdivision are the requirements that the injury be *nonaccidental* and that it be inflicted *by the parent*. (§ 300, subd. (a).)

The juvenile court's finding that the mother's vandalism in the presence of the children endangered them focused on the risk of *another* person becoming involved and the situation spinning out of control. But subdivision (a) requires that the *parent* causes the injury. (*Giovanni F., supra*, at599 [subdivision (a) is inapplicable where the violent perpetrator is not the parent].) The subdivision likewise requires the injury to be inflicted "nonaccidentally." If a third person intervened in response to the mother's vandalism, the intervenor's target would be the mother, not the children. (See *Cole L., supra,* at 603 [unintentional injury to a bystander child, even one that results from an intentional act against another, does not satisfy subdivision (a)].)

B

The record supports subdivision (b) as a basis for the court's order. This subdivision applies when the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the failure or inability of the child's parent . . . to adequately supervise or protect the child." (§ 300, subd. (b).) The petition contained two allegations under subdivision (b). We address each in turn.

1

The first allegation is that the mother endangered M.R. by leaving him alone on the doorstep of his paternal grandparents without notifying an adult. The petition also alleges this behavior places C.G. at risk.

8

The mother does not appeal the juvenile court's finding as to M.R. under this allegation. She concedes the juvenile court accepted the paternal grandparents' version of events and that their statements are substantial evidence supporting the finding.

As to C.G., however, the mother argues the finding was incorrect. She argues C.G. is differently situated than M.R. because he was nearly six years older and was verbal. She also argues she had a good relationship with C.G.'s paternal grandmother and never left C.G. alone on her doorstep.

Substantial evidence supported the finding as to C.G. The juvenile court was entitled to believe a parent who would leave a four year old alone at a front door could do the same with a 10 year old. The court also was right to think to do so would put the 10 year old at risk. Children can be childish. Even responsible 10 year olds can be unpredictable. They can be vulnerable to sudden attractions and dangers and can lack the judgment and strength to resist.

Substantial evidence supports the juvenile court's finding that the mother's conduct placed C.G. at risk of serious physical harm.

2

The petition reiterated the same facts in support of the second allegation as it listed in support of the subdivision (a) allegation, referencing the mother's "history of violent and assaultive behaviors" and describing the acts of vandalism. The Department's jurisdiction/disposition report also repeated the information about the February incident as supporting evidence with regard to the subdivision (b) allegations.

Under subdivision (b), the court must determine whether there is a substantial risk that the child will suffer serious

9

physical harm due to the parent's failure or inability to supervise or protect the child. (§ 300, subd. (b).) For this provision, the injury need not be nonaccidental or inflicted by a parent. As noted, the juvenile court said the mother's vandalism created situations that could spin out of control if third parties intervened. These situations could cause injury to bystanding children.

The mother incorrectly argues this is pure speculation. To the contrary, these inferences are reasonable and valid. With her children as bystanders, the mother was triggering provocative violence with a foreseeable potential she could not control, which posed a substantial risk of serious physical harm to the children.

The mother's contrary arguments are unavailing.

The mother complains the court denied her due process because the petition did not include information about the February incident. Any error was harmless. The Department filed its jurisdiction/disposition report on April 15, 2022. The court held the adjudication hearing on June 29, 2022. The report explicitly listed facts about the February incident as "supporting evidence" for the subdivision (a) and (b) allegations. The mother had notice the Department planned to rely on those facts.

The mother similarly argues the juvenile court improperly allowed the Department to use facts about the February incident to argue she had exposed the children to domestic violence, changing its theory of the case. Although the juvenile court did reference domestic violence, it rested its findings on the mother's vandalism. To the extent the mother argues the February incident can be viewed only as domestic violence rather than as part of a pattern of her violent vandalism, this is incorrect. The

10

juvenile court properly viewed this incident in the context of the case as a whole.

Finally, the mother complains the juvenile court improperly asserted jurisdiction under subdivision (b) because it found the mother's conduct caused the children *emotional* harm. While the juvenile court did express its belief that the mother's behavior caused the children emotional harm, as discussed above, it also properly found the children's presence during the mother's acts of vandalism exposed them to the risk of serious *physical* harm. This satisfied subdivision (b).

C

Substantial evidence supported the finding under subdivision (j), which applies where a "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300, subd. (j).) The petition repeats the allegations made in the first allegation under subdivision (b), alleging the mother's actions in leaving M.R. alone on the grandparents' doorstep endangered C.G. As discussed, substantial evidence supports the finding the mother put C.G. at risk. The court properly asserted jurisdiction over C.G. under subdivision (j).

///

11

**DISPOSITION**

We reverse the juvenile court's finding of jurisdiction under section 300, subdivision (a) as to both children. We otherwise affirm the court's jurisdictional and dispositional orders.

                                        WILEY, J.

We concur:


        GRIMES, Acting P. J.


        VIRAMONTES, J.

12