Filed 12/5/25  Selker v. Xcentric Ventures CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MARK SELKER, | D084428 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2022-00005365-CU-BT-NC) |
| XCENTRIC VENTURES, LLC, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael D. Washington, Judge.  Affirmed.

Dickinson Wright and Bennett Evan Cooper for Defendant and Appellant.

Hogue & Belong and Jeffrey L. Hogue, Tyler J. Belong; Williams Iagmin and Jon R. Williams for Plaintiff and Respondent.

Defendant and appellant Xcentric Ventures, LLC (Xcentric) appeals an order denying its Code of Civil Procedure section 425.16[1] special motion to strike plaintiff and respondent Mark Selker's first amended class action complaint. Selker brought causes of action for violation of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.) and breach of the covenant of good faith and fair dealing, alleging in part that Xcentric, which operates a consumer review/complaint website called "Ripoff Report," encourages negative commentary via reports against individuals and businesses so as to force them into paying it exorbitant fees to remove or mitigate the report's impact. In denying Xcentric's motion, the court found Xcentric did not address the relevant inquiry: whether the allegations giving rise to the asserted liability relating to Xcentric's effort to extort fees from persons who had reports issued about them, as well as its editorial control over reports by assigning them to certain categories, were protected under any of the categories of section 425.26, subdivision (e). It ruled Selker had presented evidence establishing minimal merit to his claims, including with evidence that Xcentric had placed certain labels on the negative report, and was thus acting as an "information content provider" that was not entitled to immunity under the federal Communications Decency Act (CDA; 47 U.S.C. § 230).

Xcentric contends the court erred in various ways by its ruling. It argues its reports published on a public website constitute protected activity under section 425.16, subdivisions (e)(3) and (e)(4), as the website qualifies as a public forum and its content—aiming to inform the public about allegedly

---

[1] Undesignated statutory references are to the Code of Civil Procedure. Section 425.16 is also known as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 882, fn. 2 (*Wilson*).)

unscrupulous businesses and their practices—are matters of public concern. Xcentric contends the report involving Selker specifically is a matter of public concern given his operation of multiple businesses and the nature of the report's allegations against him. It contends the court erred by finding certain allegations to be collateral or merely incidental to Selker's claims, and also by basing its ruling on the illegality exception to the anti-SLAPP statute, because no evidence conclusively established it engaged in extortion and it was undisputed Xcentric did not assign categories to the reports on its website. Xcentric finally contends the court erred by finding Selker demonstrated a probability of prevailing on his claims, in part because the CDA bars them.

We conclude Xcentric failed to make a threshold showing that Selker's UCL cause of action arises from protected activity. Accordingly, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

We summarize the background facts primarily from Selker's operative first amended complaint, undisputed facts from affidavits, and other facts in the light most favorable to Selker, the party opposing the anti-SLAPP motion. (§ 425.16, subd. (b)(2); *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*); *Murray v. Tran* (2020) 55 Cal.App.5th 10, 16.)

Xcentric operates a website, www.ripoffreport.com (the website), which permits third-party users to post reports about their negative experiences with businesses and individuals. In October 2017, Xcentric published a report about Selker and his business, Selker Fine Art, from "boba" in Encinitas, California. The report stated: "Mark Selker rents a rooms [*sic*] in a large home in Cielo Estates in Rancho Santa Fe, California and I was his

3

landlord.  He operates an art business called Mark Selker Fine Art and also is an aspiring movie maker.  While in my home he caused a lot of problems with the other tenants making up stories about the home and causining [*sic*] genral [*sic*] unharmony in the household.  Since he paid his rent on time I overlooked the problems but he was given notice immediately upon revealing that he had been accused of improper filming of a child during a recent relationship.  This was information that he offered on his own and immediately regretted backtracking his story."

Selker tried to have Xcentric remove or redact the report.  Instead, it demanded that he pay a fee and sign an arbitration agreement, or pay $5,500 for a service entitled No-Index to "de-index" the report from online search engines.

After the report was published, Selker had difficulty obtaining prospective tenants, had an unexpected decline in business sales, and was terminated from his role in another business in which his equity position was reduced from 33 percent to five percent.  His personal life and relationships suffered, and he had to stop using his last name for business and personal matters.

In late January or early February 2022, Xcentric offered Selker a discounted rate of $2,500 for its No-Index service.  Selker paid for the service, but the report was allowed to remain on the site.  Selker also asked to participate in Xcentric's "VIP Arbitration Program," but Xcentric presented its arbitration agreement on a take it or leave it basis and would not permit Selker to negotiate any terms.  Selker did not sign it.

Selker filed a putative class action complaint alleging causes of action for violation of the UCL and breach of the implied covenant of good faith and fair dealing.  Based on an arbitration clause in connection with Xcentric's No

Index service, the trial court ordered to arbitration Selker's UCL cause of action to the extent it pertained to that service, as well as his breach of covenant cause of action. The court also sustained with leave to amend a demurrer filed by Xcentric, in part ruling that Selker did not sufficiently allege harm (at least harm that did not stem from the defamatory third-party report, for which Xcentric was protected under the CDA) so as to state a UCL cause of action.

Selker filed a first amended complaint with the same causes of action. He alleged Xcentric urged consumers, including persons acting anonymously, to post negative reviews via reports against businesses and individuals so as to force those businesses and individuals into paying the website substantial fees to remove or mitigate the report's impact. He alleged that immediately under the section of the website encouraging consumers to post their negative reviews, the website solicited business owners and proprietors to pay money to take down the negative report via an exclusive arbitration program. Selker alleged that no matter the circumstances, once a report is submitted, Xcentric "will not take it down. Instead, it only offers the victim—the subject of the report—an opportunity to submit a rebuttal refuting all or a portion of the content of the report." He alleged that "by refusing to take down its reports, [Xcentric] extorts money from the victims of false reports by requiring them to pay exorbitant penalty payments in order for [Xcentric] to remove the report."

As for the report written about him, which he alleged identified him by name as well as his city, state and residential community, Selker alleged that Xcentric updated the report in February 2022 with content. Selker alleged the report "insinuated [he] may have committed a crime against a minor, which was defamatory, false, and made with malice" and that the report "was

5

made solely for purposes of harassment and perceived cyberharassment, cyberstalking, and a form of a 'revenge post.' " He alleged Xcentric "took editorial control and assigned the report to the categories of 'Questionable Activities' and 'Sex Offender' on its own."

In support of his UCL cause of action, Selker alleged that he and the classes of plaintiffs had been subjected to "extortive measures by requiring exorbitant fees before even consideration of the removal, redaction, or de-indexing reports—even those that violate [Xcentric's] terms of use." He alleged Xcentric obtained valuable property, money, and services from him and the class by its unfair, unlawful, or fraudulent business practices.[2]

Xcentric filed a special motion to strike the complaint under the anti-SLAPP statute. It argued Selker's operative complaint was an attack on its first amendment rights to participate in matters of public concern, namely "hosting a website dedicated to consumer complaints, soliciting reviews, and making editorial decisions about the third-party content . . . ." Xcentric pointed to Selker's allegations that it solicited " 'purely negative,' "

---

[2] For his claim of breach of the covenant of good faith and fair dealing, Selker alleged Xcentric "entered into a contract with users of its platform to abide by certain terms of service, including (without limitation): not to post anything that is defamatory; not to post anything 'with the sole intention to harass or bully any particular individual, including, but not limited to content that may be perceived as cyberharassment, cyberstalking, cyberbullying, or an unclassified form of a "revenge post" '; [and] reserve[ed] the right to remove private personal information and unsubstantiated allegations of serious criminal acts" but Xcentric received a report that violated one or more of its terms of service, and had an obligation to remove or at least redact the report. He alleged that when notified of the report, Xcentric charged him an exorbitant fee to de-index terms, and required him to sign a contract with unconscionable terms along with another exorbitant fee "only to potentially have the report redacted." Selker alleged that conduct amounted to extortion, and Xcentric did not otherwise act fairly and in good faith.

" 'exclusively negative,' " or " 'only negative' " reports; updated reports on its own and updated the report about Selker " 'with content' "; sold reports to other websites that reposted them; left up negative reports even if they violated Xcentric's terms of service; could post negative content about an individual or business itself, and then extort fees from victims of defamatory posts; took editorial control and assigned the report about Selker to the categories of " 'Questionable Activities' " and " 'Sex Offender' " on its own; and demanded that Selker pay for Xcentric's services. Xcentric argued Selker's new allegations arose out of protected conduct under section 425.16, subdivision (e)(3), as the website was a public forum and his allegations—concerning a consumer's statements about the quality of a seller's product—arose from matters in connection with an issue of public interest. According to Xcentric, the alleged conduct also involved "an exercise of free speech in connection with public issues and issues of public interest" within the meaning of section 425.16, subdivision (e)(4) because "[b]y operating the website as an internet public forum for consumer reviews, Xcentric directly facilitated public commentary—i.e., exercises of free speech—on public issues." Xcentric argued Selker could not meet the anti-SLAPP statue's second prong and meet the elements of his claims because he could not allege loss of money caused by its VIP arbitration service for purposes of his UCL claim; he could not present evidence to support his assertedly false allegations concerning its purported conduct with regard to the negative report; and it was immune from liability under the CDA.

Xcentric supported its motion with a declaration from its founder and manager Edward Magedson. Magedson averred that Xcentric makes redactions in reports that violate its terms of service. Among other things, he stated Xcentric took no part in authoring the report about Selker; did not

7

assign reports to categories; did not update or assign categories to the report about Selker; and never demanded Selker pay Xcentric for any services. Rather, he explained to Selker that he did not need any paid services to post a rebuttal to the report about him. Magedson averred that Selker told him he wanted to engage in both the VIP arbitration program and Xcentric's No-Index service, and Selker and Xcentric entered into a contract for the No-Index service, but Selker took issue with some of the arbitration contract terms, and ultimately decided against arbitration.

In opposition, Selker argued Xcentric mischaracterized the theory of liability alleged in his operative complaint. According to him, he alleged Xcentric violated the UCL "through its extortive business practice of soliciting purely negative and defamatory posts to [Xcentric's] website for the purpose of charging the victims of these negative and defamatory posts exorbitant sums of money to have the posts removed by [Xcentric]—the only company with the power to remove such posts." He stated "the question is *not* whether the *third-party*'s post is protected, but whether [Xcentric's] *predatory and extortive business practice* is protected by the First Amendment." He argued Xcentric's conduct constituted extortion, which was not a constitutionally protected activity. Though Selker conceded that publicly available websites were public forums, he argued mere publication on a website did not convert private information into a matter of public interest and in his case, the statements contained in his negative report— which were about his history as a tenant and landlord and insinuated he was sexually deviant—were not made in connection with any public interest or topics of widespread interest. As for the report's claim of improper filming of a child, Selker argued the report was too vague to determine whether it was

of concern to the public.[3] Selker submitted a declaration of his counsel attaching pages of Xcentric's website, as well as e-mail correspondence between himself and Magedson assertedly showing how Xcentric "executes its extortionary scheme." Selker argued "[t]he limited evidence available shows: (1) [Xcentric] specifically targets negative or defamatory reports that will create 'business value' for [Xcentric]; (2) [Xcentric] asserted the only way it would remove the defamatory post is if Selker paid an exorbitant fee; and (3) Magedson unilaterally and arbitrarily controls (and increases) the price of [Xcentric's] services." He maintained he thereby demonstrated the minimal probability of success on his claim. Selker argued the CDA did not apply to Xcentric because (1) his alleged theories of liability did not impose liability by treating Xcentric as the publisher or speaker of the report and (2) Xcentric was both an interactive computer service and information content provider in view of its feature that "steer[ed] the *substance* of the reports" by requiring users to identify negative report categories such as "Child Sex Trafficking" or "Child Predator."

The trial court denied Xcentric's motion. It found based on the first amended complaint's allegations, "the activity that gives rise to the asserted liability relates to: (a) whether [Xcentric] has violated [the UCL] through '[a] systematic course of illegal efforts to extort exorbitant fees from persons in California who have had reports issued about them' . . . and (b) whether

---

[3] Selker argued: "For instance, the statement lacks any information about: (i) whether the '*accused* improper filming' was true or false; (ii) what specifically made the alleged filming 'improper[';] (iii) whether the child involved was filmed with parental consent; (iv) whether the child was Selker's own child; and (v) whether the alleged filming was lawful or unlawful. It is difficult to imagine how such a false and vague accusation—though extremely hurtful to Selker—would rise to the level of 'public interest.'"

[Xcentric] 'took editorial control and assigned the report to the categories of "Questionable Activities" and "Sex Offender" on its own.' " The court found Selker's allegations concerning the "boba" complaint—as well as other allegations concerning Xcentric's conduct in targeting or seeking out negative commentary, updating reports, allowing negative reviews to remain, and doing business with other companies—were collateral and provided to give context to the claims.

The court agreed that statements posted on Internet message boards questioning and/or criticizing the business practices or ethics of public individuals, companies and their officers are generally matters of public interest and concern subject to section 425.16 protection. However, the court was "not entirely persuaded that the boba report contained issues of public interest because [Selker] is not a public figure and the statements regarding [Selker] as a tenant and landlord do not affect a large number of people nor do they involve actions of widespread public interest." It found "the statement in the report regarding the 'improper filming of a child' arguably involves an action of widespread public interest." But the court ruled Xcentric did not demonstrate it was entitled to anti-SLAPP protection: "[T]he problem relating to the first prong of the analysis is that [Xcentric] has not addressed whether the allegations giving rise to the asserted liability relating to extortion and [Xcentric] taking editorial control by assigning reports to certain categories are protected under any of the subdivisions of [section] 425.26[, subdivision] (e)." It ruled that "[e]xtortion is not a constitutionally protected form of speech," observing that " '[e]xtortion criminalizes making threats that by themselves may not be illegal; for example, in blackmail cases, "the threat is to do something in itself perfectly

10

legal, but that threat nevertheless becomes illegal when coupled with a demand for money." ' "

The court ruled the CDA did not immunize Xcentric's conduct. It reasoned Selker "is not attempting to impose liability against [Xcentric] for its role as a publisher or speaker. Rather, [Selker's] theory of liability is based on allegations that [Xcentric] is engaged in an unfair scheme of exclusively soliciting negative reports for the purpose of price-gouging the victims in order to hide, redact or remove such reports. Further, [Selker] alleges that [Xcentric] is not simply publishing content by other parties but is going inside those reports and 'steering' the reports into categories created by Defendant ('Slumlord, Criminal, Sexual Abuser')." The court observed that Selker alleged Xcentric "contributes to the negative and defamatory nature of the reports by steering [them] into negative categories (fraud, theft, child predator, slumlord, sexual abuser, child sex trafficking and sexual misconduct against a patient just to name a few)" and that "[Xcentric] then allegedly extorts money from the subjects of the negative reports to remove, redact or de-index the report." It ruled Xcentric had "failed to present evidence demonstrating that it does not place labels on reports in an effort to direct reports into certain negative categories."

Finally, the court ruled Selker had shown minimal merit in his claims via e-mail threads establishing that Xcentric "specifically solicits negative or defamatory reports for the purpose of extorting excessive fees from victims of those reports to remove them."

Xcentric filed this appeal.

11

## DISCUSSION

### I. *Legal Principles and Standard of Review*

"The Legislature enacted . . . section 425.16 to combat 'a disturbing increase' in strategic lawsuits against public participation (SLAPPs): 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1242.) " 'To that end, the statute authorizes a special motion to strike a claim "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." ' " (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1008-1009 (*Bonni*).) Section 425.16 "does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.)

The statute's protection extends to "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" (§ 425.16, subd. (e)(3)) as well as "any other conduct in furtherance of the exercise of the constitutional right of petition or . . . free speech in connection with a public issue or an issue of public

interest." (§ 425.16, subd. (e)(4); *Geiser v. Kuhns*, *supra*, 13 Cal.5th at p. 1243.)[4]

"[W]hen a defendant seeks to strike a plaintiff's claim under the anti-SLAPP statute there are two inquiries:  First, does the claim call for the anti-SLAPP statute's protections?  Second, if so, does it have sufficient merit?" (*Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 871-872.) In this two-pronged inquiry, " 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.  [Citations.]  If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' " (*Wilson, supra,* 7 Cal.5th at p. 884.)

When determining whether conduct is protected under the anti-SLAPP statute, we "look not to First Amendment law, but to the statutory definitions in section 425.16, subdivision (e)." (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422.)  "The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute.  A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.'  [Citation.]  To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what

---

[4]    Section 425.16, subdivision (e) identifies two other categories of statements or writings that are " ' "in furtherance of" ' a defendant's free speech or petition rights:  '(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, [and] (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law[.]' " (*Gaynor v. Bulen* (2018) 19 Cal.App.5th 864, 877.)

actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Wilson, supra*, 7 Cal.5th at p. 884; see also *Bonni, supra*, 11 Cal.5th at p. 1009.)

"If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt, supra*, 1 Cal.5th at p. 384.) This second step is a " 'summary-judgment-like procedure.' " (*Ibid*.) "[T]he plaintiff's second-step burden is a limited one. The plaintiff need not prove her case to the court [citation]; the bar sits lower, at a demonstration of 'minimal merit' [citation]. At this stage, ' "[t]he court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." ' " (*Wilson, supra*, 7 Cal.5th at p. 891.) But "a plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940.) If the plaintiff cannot make the required showing, the court will strike the claim. (*Bonni, supra*, 11 Cal.5th at p. 1009.)

We review de novo whether Xcentric met its burden of demonstrating that the activity from which the lawsuit arises falls within the scope of the anti-SLAPP statute's protection. (*Geiser v. Kuhns, supra*, 13 Cal.5th at p. 1250; *Meads v. Driggers* (2025) 114 Cal.App.5th 28, 35.) "[W]e may affirm

14

the trial court's order 'if it is correct on any ground, regardless of the trial court's reasoning.' " (*Mead*s, at p. 36.)

## II. *Claims Arising from Protected Activity*

We first ask whether Xcentric met its burden to establish that Selker's UCL claim arises from activity protected under section 425.16, meaning that it demonstrated that protected activity itself "underlies or forms the basis for the claim." (*Park*, *supra*, 2 Cal.5th at pp. 1062-1063.) At this first step, Xcentric "must identify the acts alleged in the complaint that it asserts are protected and what claims for relief are predicated on them." (*Bonni*, *supra*, 11 Cal.5th at p. 1010.) " '[A]ssertions that are "merely incidental" or "collateral" are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' " (*Bonni*, at p. 1012.) "[T]o the extent any acts [supporting Selker's claim of recovery] are unprotected, the claims based on those acts will survive." (*Ibid*.)

The elements of the challenged claim are used to assess what " 'actions by [Xcentric] supply those elements and consequently form the basis for liability.' " (*Bonni*, *supra*, 11 Cal.5th at pp. 1009, 1015; *Sandoval v. Pali Institute* (2025) 113 Cal.App.5th 616, 628.) Our analysis is not confined to the entire cause of action; we must "analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected[.]" (*Bonni*, at p. 1010.)

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200; accord, *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370.) "By proscribing 'any unlawful' business act or practice . . . , the UCL ' "borrows" ' rules set out in other laws and makes

violations of those rules independently actionable. [Citation.] However, a practice may violate the UCL even if it is not prohibited by another statute. Unfair and fraudulent practices are alternate grounds for relief." (*Zhang*, at p. 370.) The action has narrow remedies; " '[p]revailing plaintiffs are generally limited to injunctive relief and restitution. [Citations.] Plaintiffs may not receive damages . . . or attorney fees.' " (*Id*. at p. 371.) " 'Restitution under [the UCL] is confined to restoration of any interest in "money or property, real or personal, which may have been *acquired* by means of such unfair competition." . . . A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other.' " (*Ibid*.)

In his operative pleading, Selker alleges Xcentric:

• "uniquely targets and seeks out negative commentary via 'reports' against individuals and businesses to force them into paying [it] substantial fees to remove or mitigate the impact of the report" and "encouraged exclusively negative reviews and allegations against businesses and proprietors";

• made "solicitations to consumers" on its home page, "urging them to post negative reviews about those they've done business with";

• on its website appearing immediately after the consumer solicitation "solicited business owners and proprietors to pay [it] money to take down the negative report via [its] exclusive arbitration program";

• "permits negative reviews to be posted by anonymous parties" or under fake names so it "could post negative content about an individual or business itself, and then extort fees from victims of defamatory posts";

• "requires the victims of reports to pay their extortion fees . . . before it will even reveal the anonymous poster";

16

- "intentionally does not remove reviews even though those reviews violate [its] terms of service so they can extort more money from businesses and individuals who are the subject of the report";

- "has various other additional income streams where it promises to mitigate the impact of a negative review in exchange for compensation"; and

- "allows other websites claiming to be neutral review sites to post the reports about businesses and individuals."

Selker goes on to allege specifics about the report posted by boba, including that Xcentric "took editorial control and assigned the report to the categories of 'Questionable Activities' and 'Sex Offender' on its own." He alleges "[a]ll of the acts described herein are unlawful and in violation of public policy" and additionally "such acts are immoral, unethical, oppressive, fraudulent, and unscrupulous, and thereby constitute unfair, unlawful, or fraudulent business practices in violation of [the UCL]."

A. *Allegations Giving Rise to Liability Versus Incidental or Collateral Matters*

The parties dispute what allegations form the basis of Selker's UCL claim and Xcentric's alleged liability. As Xcentric frames it, Selker complains about "speech" and consumer statements or activities concerning consumer goods. Xcentric refers to case law involving " 'consumer's statements about the quality of a seller's products and service and her unhappiness with them . . .' " or " 'peaceful activities . . . which inform [consumers] about issues they care about . . . .' " It argues it had constitutional protections afforded to it "because of the website's expressive activities . . . ."

On that premise, Xcentric asserts its "entire goal in maintaining the website is to facilitate transparency to consumers regarding the quality and

trustworthiness of companies or individuals that offer services to the public, so that any potential consumer can be fully informed before interacting with those businesses or people." It maintains that such consumer statements are matters of public interest for purposes of both subdivisions (e)(3) and (e)(4) of section 425.16. Xcentric asks us to reject Selker's "attempted reframing," suggesting this is a situation where his lawsuit is " 'masquerading' " as something it is not so as to chill the exercise of free speech. It broadly argues the complaint "and each claimed injury—centers on [Selker's] humiliation from the report's being made public on the website"; that the unflattering report "is the *only* set of facts that gives life to the [first amended complaint] at all." According to Xcentric, the proper analysis of what is incidental or collateral requires that we "look to the thrust of the claim."

Interspersed in these contentions are arguments about how the superior court erred in its analysis, including by applying a test that ignores the broad reach of the anti-SLAPP statute, or misreading and mischaracterizing the first amended complaint, thus failing to recognize the protected activity at the heart of Selker's claim. These arguments ignore the manner in which we review the court's ruling on appeal. As stated above, it does not matter if the court used an incorrect standard if it reached the correct result. (*Meads v. Driggers*, *supra*, 114 Cal.App.5th at p. 36.) The superior court's specific reasoning is not relevant on appeal.

We are not persuaded by Xcentric's framing of Selker's first amended complaint. Even assuming a consumer complaint about a business is anti-SLAPP protected activity, a claim may be struck only if the protected activity itself is the wrong complained of, not just evidence of liability or a step leading to a different act for which liability is asserted. (*Wilson*, *supra*, 7 Cal.5th at p. 884; *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th

18

610, 621 ["[A] claim does not 'arise from' protected activity simply because it was filed after, or because of, protected activity, or when protected activity merely provides evidentiary support or context for the claim"]; *Park*, *supra*, 2 Cal.5th at p. 1060.) Here, we agree with Selker that his UCL claim targets Xcentric's unlawful or unfair business practices, not boba's negative report, or even Xcentric's hosting of negative consumer reports on its website. The injurious practices—and the acts for which liability is asserted—are Xcentric's solicitation of exclusively negative reports, including by anonymous individuals, for the purpose of forcing the reports' subjects to compensate it for services to remove or mitigate the impact of the consumer's damaging complaints. Other allegations regarding the boba complaint and its emotional or financial impact on Selker do not give rise to UCL liability, which does not permit damages. (*Zhang v. Superior Court*, *supra*, 57 Cal.4th at p. 371.) Those allegations in our view are collateral or incidental, and provide context to the conduct giving rise to liability under the UCL. They therefore do not trigger anti-SLAPP protection. (*Bonni*, *supra*, 11 Cal.5th at p. 1012.)

Further, Xcentric misses the mark when it argues we must look to the thrust or principal thrust to identify the foundation for Selker's claim. For those principles, it relies in part on *Okorie v. Los Angeles Unified School District* (2017) 14 Cal.App.5th 574. *Bonni*, however, disapproved *Okorie* and use of the "gravamen" or "principle thrust" test to "determine the essence or gist of a . . . mixed cause of action." (*Bonni*, *supra*, 11 Cal.5th at pp. 1011-1012 & fn. 2; see also *Sandoval v. Pali Institute, Inc., supra,* 113 Cal.App.5th at p. 628 [Although at one time courts were applying a gravamen test in the first step of an anti-SLAPP analysis, the Supreme Court has made clear it is

19

not the proper inquiry].)[5] Though *Bonni* stated it may be proper to invoke the gravamen test to determine whether particular acts alleged within a cause of action supply the elements of a claim (versus being incidental background, *id*. at p. 1012), Xcentric has not attempted to discuss the UCL's elements. In our view, this omission, as well Xcentric's reliance on *Okorie*'s discussion of a "complaint's leitmotiv" (*Okorie*, at p. 595), shows it is not using the "gravamen" approach in the manner *Bonni* says is permissible.

Because Xcentric misidentifies the activity forming the basis for Selker's UCL claim as speech or the damaging boba report, it arguably has failed to meet its first step anti-SLAPP burden. "If a cause of action contains multiple claims and a moving party fails to identify how the . . . conduct underlying some of those claims is protected activity, it will not carry its first-step burden as to those claims." (*Bonni, supra*, 11 Cal.5th at p. 1011; see *Park v. Nazari* (2023) 93 Cal.App.5th 1099, 1108 [defendant moving to strike entire complaint did not carry its first-step anti-SLAPP burden in part where it did not identify each claim for relief and relied on the improper "gravamen" analysis].) But Xcentric does touch on Selker's extortion allegations, so we

---

[5]     *Bonni* explained: "If we were . . . to adopt [the] proposed gravamen approach, we would again risk saddling courts with an obligation to settle intractable, almost metaphysical problems about the 'essence' of a cause of action that encompasses multiple claims. [Citation.] The attempt to reduce a multifaceted cause of action into a singular 'essence' would predictably yield overinclusive and underinclusive results that would impair significant legislative policies. Striking a cause of action that rests in part on unprotected activity constrains a plaintiff's ability to seek relief without advancing the anti-SLAPP's goals of shielding protected activity, which would have been fully served by striking from the complaint only the allegations of protected activity. Conversely, refusing to strike any part of a cause of action that rests in part on protected activity defeats the legislative goal of protecting defendants from meritless claims based on such conduct." (*Bonni, supra*, 11 Cal.5th at p. 1011.)

will address whether any of its points establish conduct protected under section 425.16, subdivisions (a)(3) or (a)(4).

B. *Public Forum for Purposes of Section 425.16, Subdivision (e)(3)*

Xcentric argues its public website is a public forum. Selker, who conceded the point below, does not meaningfully contest the issue; he merely notes that Xcentric cites authority for the "uncontroversial proposition that websites can be 'public forums . . . .' " The law is more clear: "Websites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4; see also *Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 917 ["Internet postings on websites that ' "are open and free to anyone who wants to read the messages" ' and 'accessible free of charge to any member of the public' satisfies the public forum requirement of section 425.16"; citing cases].) This does not help Xcentric where the "wrong complained of" (*Park, supra*, 2 Cal.5th at p. 1060) is not "any written or oral statement or writing" made on Xcentric's website, but its business conduct summarized above. Accordingly, as to section 425.16, subdivision (a)(3), Xcentric has not demonstrated it is entitled to anti-SLAPP protection.

C. *Public Issue or Issue of Public Interest*

Xcentric can qualify for protection under subdivision (e)(4) of section 425.16 if it shows Selker's complaint is based on "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subdivision (a)(4).)

The *Bonni* court addressed how to determine whether challenged conduct falls within section 425.16(e)(4)'s "catch-all" protection. It observed the statute "does not . . . 'define precisely how, or to what extent, conduct

21

must further the exercise of speech or petition rights to merit protection." (*Bonni, supra*, 11 Cal.5th at p. 1020.) *Bonni* explains that we must ask "whether [the conduct] furthered [the defendant's] speech or petitioning rights because [it bears] some 'substantial relationship' to [defendant's] 'ability to [petition or] speak on matters of public concern.' " (*Bonni*, at p. 1020.) The "inquiry . . . turns . . . on whether [Xcentric's] conduct advances [its] '*ability* to speak [or petition] on matters of public concern.' " (*Id*. at p. 1022.) Thus, in *Bonni*, involving hospitals' adverse disciplinary actions based on their view of a doctor's suspect competence (which was "not speech at all," *id*. at p. 1021), the court found "no [apparent] connection between the Hospitals' choice of which doctors should receive staff privileges and its ability to speak or petition on public issues." (*Id*. at p. 1022.) This was the case even though the discipline "triggered a peer review hearing, an official proceeding during which the Hospitals' medical executive committee petitioned in support of its action, and the suspensions supplied the occasion for reports to the Medical Board . . . and [a] Data Bank. . . . But that sort of causal link does not mean the suspensions advanced the Hospitals' ability to speak or to petition on matters of public concern in any substantial way. . . . Section 425.16, subdivision (e)(4) does not extend protection to every bit of conduct factually related to actual speech . . . ." (*Id*. at pp. 1022-1023.)

Xcentric does not engage in this analysis with respect to its business practice of soliciting negative consumer reports, and promotion of services to compel subjects of reports to pay to remove or mitigate their impact. Rather, Xcentric argues Selker's extortion allegations "cannot take the complaint outside of the anti-SLAPP statute because extortion has not been 'conclusively established' " and as a result, the "illegality exception" cannot apply. This argument refers to the principle that a defendant may not seek

22

anti-SLAPP protection "based on a claim that the plaintiff's action arises from activity by the defendant in furtherance of [its] exercise of protected speech or petition rights" when "either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity is illegal as a matter of law." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 320.) It is true that Selker made arguments below seeking to apply this illegality exception. But regardless of the label Selker placed on Xcentric's conduct or the possible applicability of the illegality exception,[6] it remains Xcentric's burden to establish that the conduct serving as the basis for Selker's claim was protected. As in *Bonni*, we see no connection between Xcentric's business conduct and its ability to speak on public issues. (*Bonni, supra*, 11 Cal.5th at p. 1022.)

Xcentric further argues Selker's allegations that it assigned labels to the reports on its website likewise does not overcome anti-SLAPP protection because it presented undisputed evidence via Magedson's declaration that it did not assign such labels or categories.[7] On the first step of the anti-SLAPP

---

[6]     *Flatley* made clear that when faced with a claim of illegal conduct, "[i]f . . . a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the [anti-SLAPP statute's] first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits." (*Flatley v. Mauro, supra*, 39 Cal.4th at p. 316.)

[7]     In response, Selker reframes his allegations as stating that Xcentric "contributes to extortionary value by steering [the reports] into negative and inflammatory categories (e.g. 'Fraud,' 'Theft,' 'Child Predator,' 'Slumlord,' etc.) to maximize their impact," then adds content to identify the reports' targets. But the allegation is that Xcentric "took editorial control and assigned the report to the categories . . . on its own." Selker's point is that the allegations take Xcentric outside of CDA immunity, which we do not reach as it is implicated in the anti-SLAPP motion's second prong.

analysis, we are not required to accept the complaint's allegations as true if the defendant submits contrary evidence. (*Wilson, supra*, 7 Cal.5th at p. 887.) Rather, we may look beyond the pleadings to consider evidentiary submissions by the parties. (*Ibid.*) Xcentric is correct that Selker offered no evidence to dispute Magedson's assertion. But the point does not help Xcentric, which has not demonstrated the other business activity underlying Selker's claim qualifies for protection.

We conclude Xcentric failed to make a threshold showing that Selker's UCL cause of action arises from protected activity. Accordingly, the burden does not shift to Selker to demonstrate that his claim has minimal merit, and we need not reach the second prong of the anti-SLAPP analysis. (*Baral v. Schnitt, supra*, 1 Cal.5th at p. 396 [only "[i]f the court determines that relief is sought based on allegations arising from activity protected by the statute" is the "second step . . . reached"].)

## DISPOSITION

The order denying Xcentric's anti-SLAPP motion is affirmed. Selker is entitled to his costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:

DO, J.

BUCHANAN, J.

24